22 F.3d 1296
 62 USLW 2733
 Sarah E. FAGAN, General Administratrix and Administratrix Ad
Prosequendum of the Estate of Michael J. Fagan, Deceased
v.
The CITY OF VINELAND, a Municipal Corporation of the State
of New Jersey; Joseph Cassisi, Jr., Chief of Police of the
City of Vineland; Police Officers David Tesoroni; Peter F.
Coccaro, III; Benny Velez; Phillip C. Bocceli; Richard
Putnam; David Cardana; Mario R. Brunetta, Jr.; John Does,
(fictitious names) representing other police officers of the
City of Vineland Police Department; Town Liquors, a/d/b/a
VTL, Inc.; Marquez Amnon Corporation, a/d/b/a East Landis
Hotel and Motel; John Doe, (fictitious name) agent, servant
or employee selling liquors for Marquez Amnon Corporation,
a/d/b/a East Landis Hotel and Motel; Jeffrey T. Pindale;
and Mary Ellen Duke, Administratrix of the Estate of
Christopher M. Duke, Deceased, jointly, severally and in the
alternative.
Wanda PINDALE
v.
TOWN LIQUORS, a/d/b/a VTL, Inc.; John Doe I, (fictitious
name) agent, servant or employee selling liquors for Town
Liquors, a/d/b/a VTL, Inc.; Marquez Amnon Corporation
a/d/b/a East Landis Hotel and Motel; John Doe II,
(fictitious name) agent, servant or employee selling liquors
for Marquez Amnon Corporation, a/d/b/a East Landis Hotel and
Motel; The City of Vineland, a Municipal Corporation of the
State of New Jersey; Joseph Cassisi, Jr., Chief of Police
of the City of Vineland; David Tesoroni; John Doe III;
and John Doe IV, (fictitious names) representing other
police officers of the City of Vineland Police Department;
and Jeffrey T. Pindale, jointly, severally and in the alternative
v.
Mary Ellen DUKE, Administratrix of the Estate of Christopher
M. Duke, Third Party Defendant.
Maurice G. DAVIS, Jr.
v.
VTL, INC. a/d/b/a Town Liquors; John Doe I, (fictitious
name) agent, servant or employee selling liquors for VTL,
Inc., a/d/b/a Town Liquors; Marquez Amnon Corporation
a/d/b/a East Landis Hotel and Motel; John Doe II,
(fictitious name) agent, servant or employee selling liquors
for Marquez Amnon Corporation a/d/b/a East Landis Hotel and
Motel; The City of Vineland, a Municipal Corporation of the
State of New Jersey; Joseph Cassisi, Jr., Chief ofPolice of
the City of Vineland; David Tesoroni; John Doe III, and
John Doe IV, (fictitious names) representing other police
officers of the City of Vineland Police Department; and
Jeffrey T. Pindale, jointly, severally and in the alternative
and
Jeffrey T. PINDALE, Third Party Plaintiff,
v.
Mary Ellen DUKE, Administratrix of the Estate of Christopher
M. Duke.
Albino GENETTI, Administrator Ad Prosequendum of the Estate
of Albert Stavoli, Deceased
v.
VTL, INC. a/d/b/a Town Liquors; John Doe I, (fictitious
name) agent, servant or employee selling liquors for VTL,
Inc. a/d/b/a Town Liquors; Marquez Amnon Corporation
a/d/b/a East Landis Hotel and Motel; John Doe II,
(fictitious name) agent, service or employee selling liquors
for Marquez Amnon Corporation a/d/b/a East Landis Hotel and
Motel; The City of Vineland, a Municipal Corporation of the
State of New Jersey; Joseph Cassisi, Jr., Chief of Police
of the City of Vineland; David Tesoroni; John Doe III, and
John Doe IV, (fictitious names) representing other police
officers of the City of Vineland Police Department; and
Jeffrey T. Pindale, jointly, severally and in the alternative
v.
Mary Ellen DUKE, Administratrix of the Estate of Christopher
M. Duke, Third Party Defendant.
Mary Ellen DUKE, Administratrix and Administratrix Ad
Prosequendum of the Estate of Christopher M. Duke, Deceased
v.
Jeffrey T. PINDALE, presently incarcerated at the Trenton
State Prison; Town Liquors a/d/b/a VTL, Inc.; Marquez
Amnon Corporation a/d/b/a East Landis Hotel and Motel; John
and Jane Does, fictitious names, for unknown entities and
persons believed to have sold, served, or otherwise provided
liquors to Jeffrey T. Pindale, the City of Vineland, a
Municipal Corporation of the State of New Jersey, County of
Cumberland, New Jersey; John and Jane Does, fictitious
names, for unknown governmental entities and for unknown
individuals believed to be police officers of said
government entities involved in an unlawful high speed
automobile pursuit; Joseph Cassisi, Sr., individually and
as an agent of the Vineland Police Department; Mario R.
Brunetta, Jr., individually and in his official capacity as
the Captain of the City of Vineland Police Department;
David Tesoroni, individually and in his official capacity as
a member of the City of Vineland Police Department; Peter
F. Coccaro, III, individually and in his official capacity
as a member of the City of Vineland Police Department;
Benny Velez, individually and in his official capacity as a
member of the City of Vineland Police Department; Phillip
C. Boccelli, individually and in his official capacity as a
member of the City of Vineland Police Department; Richard
Putnam, individually and in his official capacity as a
member of the City of Vineland Police Department; John and
Jane Does, fictitious names for unknown individuals believed
to be other police officers of the City of Vineland Police
Department involved in an unlawful high speed automobile
pursuit, jointly, severally and in the alternative,
Mary Ellen Duke and Sarah Fagan, Appellants No. 92-5481,
Appellants No. 92-5594,
Maurice G. Davis, Jr., Wanda Pindale and Albino Genetti,
Appellants No. 92-5482, Appellants No. 92-5551.
 Nos. 92-5481, 92-5482, 92-5551 and 92-5594.
 United States Court of Appeals,
Third Circuit.
 Argued May 6, 1993.
Reargued In Banc Oct. 19, 1993.
Decided April 29, 1994.
 
 Gerald M. Eisenstat, Harry Furman (argued), Eisenstat, Gabage, Berman & Furman, Vineland, NJ, for appellant Sarah E. Fagan.
 John M. Fitzpatrick, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA, for appellant Mary Ellen Duke.
 Arnold Robinson, Milville, NJ, for appellant Wanda Pindale.
 Harold B. Shapiro, Dana D. Teague, Shapiro & Shapiro, Vineland, NJ, for appellant Maurice G. Davis, Jr.
 Frank G. Basile, Basile, Testa & Testa, Vineland, NJ, for appellant Albino Genetti.
 A. Michael Barker (argued), Horn, Goldberg, Gorny, Daniels, Paarz, Plackter & Weiss, Atlantic City, NJ, for appellees City of Vineland, David Tesoroni, Peter F. Coccaro, III, Benny Velez, Phillip C. Bocelli, Richard Putnam, David Cardana, David Cassisi, Sr. and Mario R. Brunetta, Jr.
 Richard M. Pescatore, Perlow, Sebera & Pescatore, Bridgeton, NJ, for appellee Town Liquors a/d/b/a VTL, Inc.
 Stacy L. Moore, Jr., Parker, McCary & Criscuolo, Marlton, NJ, for appellee Marquez Amnon Corp. d/b/a East Landis Hotel and Motel.
 Peter W. Sachs, Sachs & Sachs, Holmdel, NJ, for appellee Estate of Christopher M. Duke.
 Before: SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges.OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 
 1
 Before us is the appeal of the district court's order granting summary judgment to the defendant police officers, the City of Vineland, and defendant Town Liquors in a suit brought by and on behalf of the estates of persons injured by a car driven by Jeffrey Pindale which was the subject of a police pursuit. The principal issue before the in banc court is the standard to be applied to claims that the police pursuit violated substantive due process. Because we are reviewing a grant of summary judgment, we will view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving parties, the plaintiffs. See Clement v. Consolidated Rail Corp., 963 F.2d 599, 600 (3d Cir.1992).
 
 I.
 FACTS AND PROCEDURAL HISTORY
 
 2
 The events which are the subject of the lawsuit began at about 1:55 a.m. on March 6, 1988, when defendant Officer David Tesoroni of the Vineland Police Department was on routine patrol on Landis Avenue in Vineland, New Jersey. Landis Avenue is the main street running through the City's business district and is a popular gathering and cruising place for young people. As Officer Tesoroni headed west on Landis Avenue, he spotted a white Camaro heading east. The Camaro was not speeding, but a passenger was standing up through the car's open T-top roof and waving his arms. The car was driven by Jeffrey Pindale, age 20; the passengers were his wife Wanda Pindale, age 19, and his friends Albert Stavoli, age 19, and Maurice Davis, Jr., age 19.
 
 
 3
 Unknown at that time to Officer Tesoroni, Jeffrey Pindale had purchased two bottles of Strawberry Hill Wine from defendant Town Liquor on March 5, 1988, and had spent the evening eating and drinking with his wife and friends Stavoli and Davis. Jeffrey Pindale drank the Strawberry Hill wine as well as alcoholic beverages purchased from other vendors. After the accident, his blood alcohol level was .12%.
 
 
 4
 When he saw the Camaro, Tesoroni made a U-turn on Landis Avenue and accelerated. He intended to give the driver a warning regarding a violation described by him as "allowing his passenger to ride on parts not intended for." Plaintiffs' App. at 15. The Camaro turned right onto Eighth Street and headed south into a residential neighborhood. Tesoroni followed the Camaro onto Eighth Street and, as he made the turn, activated his overhead lights but not his siren. The Camaro drove for two blocks south to the intersection with Grape Street. Up until this point, Tesoroni was following the Camaro solely because he wanted to warn the driver about allowing his passenger to stand through the T-top.
 
 
 5
 The Camaro turned right onto Grape Street, entering a residential neighborhood which had a 25 mile-per-hour speed limit. The Camaro accelerated to between 35 and 40 miles per hour and, heading west, drove through two stop signs where it slowed down but failed to stop. Tesoroni accelerated to between 30 to 35 miles per hour and followed the Camaro, slowing down but not stopping for the stop signs. The Camaro turned left onto Sixth Street and headed south for one block, and then left again onto Montrose Street heading east. At this point, Tesoroni radioed police headquarters and informed them of his actions.
 
 
 6
 The pursuit continued through the residential neighborhood, and more stop signs were run. Defendant Officer Richard Putnam was on patrol that evening. The Camaro sped down Almond Street and passed him. Putnam radioed police headquarters and stated that the "[s]ubject just swerved at me." Plaintiffs' App. at 14. When the Camaro reached the intersection of Almond Street and East Avenue, the driver turned its lights off. At this point, Tesoroni turned on his siren. The Camaro accelerated to 40 miles per hour and headed south on East Avenue for one block, then left onto Michigan Avenue for one block, and then south onto Myrtle Avenue for two more blocks until he reached Chestnut Avenue. Tesoroni accelerated to keep up with it.
 
 
 7
 At police headquarters, defendant Sergeant Edgar Zatzariny was in charge. He had the authority to order Tesoroni to discontinue the pursuit, but he did not do so. Sergeant Zatzariny directed the dispatcher to ask Tesoroni why he was pursuing the Camaro, but Tesoroni never responded.
 
 
 8
 The Camaro turned right onto Chestnut Avenue, a four-lane road with two lanes in each direction, and accelerated to 50 miles per hour heading west. Officer Putnam pulled out onto Chestnut Avenue from a sidestreet and blocked the outside westbound lane, with his headlights and overhead lights on. Putnam waved his arms to signal the Camaro to stop. It sped past him at more than 50 miles per hour, with Tesoroni in pursuit. Putnam then pursued the Camaro until the dispatcher told him to "break off." Plaintiffs' App. at 14. During the chase on Chestnut Avenue, Officer Peter Coccaro used his patrol car to block off Eighth Avenue where it intersected with Chestnut Avenue. The Camaro sped past him as well. Coccaro may have also engaged in pursuit for a time.
 
 
 9
 Defendant Officer Benny Velez drove to Chestnut Avenue from Sixth Street. He saw the Camaro speed past him with Tesoroni one to two blocks behind. Velez turned onto Chestnut Avenue behind the Camaro and in front of Tesoroni, thus becoming the lead officer in the pursuit. Velez had his siren and overhead lights on. The Camaro was going 70 to 80 miles per hour, and Velez pursued at 50 to 60 miles per hour. The Camaro and the pursuing police cars ran several red lights on Chestnut Avenue.
 
 
 10
 As Velez drove over a rise at about Chestnut Avenue and Fourth Street, he saw the Camaro several blocks ahead at Chestnut Avenue and Holly Hill Terrace. Velez radioed headquarters that the car was approaching the intersection of Chestnut Avenue and Delsea Avenue, one block further away. Delsea Avenue, like Chestnut Avenue, is one of the main thoroughfares of Vineland. The Camaro ran a red light at the intersection and broadsided a pickup truck traveling on Delsea Avenue. The occupants of the pickup truck, Michael Fagan and Christopher Duke, were killed. Stavoli was killed. Wanda Pindale and Maurice Davis suffered crippling injuries. Jeffrey Pindale, the driver, suffered minor injuries. A witness stated that immediately after the collision he saw four police cars approach the accident scene from the westbound lanes of Chestnut Avenue with their overhead lights and sirens on.
 
 
 11
 At the time of the accident, the City of Vineland had adopted the statewide guidelines governing high-speed motor vehicle pursuits promulgated by the New Jersey Attorney General and the New Jersey County Prosecutors Association.[1] Plaintiffs' expert witness, Dr. Leonard Territo, a criminologist, wrote in his report and testified in deposition that in his opinion the defendant police officers exercised their discretion in determining whether to pursue the Camaro, but that they conducted the pursuit in a reckless manner in excess of the discretion vested to them by the guidelines.
 
 
 12
 In January through March of 1990, the plaintiff-appellants Sarah Fagan, Maurice Davis, Jr., Wanda Pindale, Albino Genetti, and Mary Ellen Duke filed their complaints in the United States District Court for the District of New Jersey. They alleged that various Vineland police officers, including Officers Tesoroni, Velez, Putnam, and Coccaro, violated 42 U.S.C. Sec. 1983 and their Fourteenth Amendment substantive due process rights by recklessly conducting the high-speed pursuit in violation of the Attorney General's guidelines. Plaintiffs brought separate, independent claims against the City and Police Chief Joseph Cassisi, Jr. for violating section 1983 and the Fourteenth Amendment by following a policy of not properly training and supervising police officers in the conduct of high-speed pursuits, and by following a policy of not enforcing the pursuit guidelines. Plaintiffs also sued defendant Town Liquors under New Jersey law for negligently selling alcoholic beverages to an underaged drinker and thus contributing to the accident. They brought various other claims under the Fourth Amendment and state law that were not appealed.
 
 
 13
 These five actions were consolidated. The case was originally assigned to Judge Joseph H. Rodriguez. After completion of discovery, the defendant police officers and City made their first motion for summary judgment. On July 26, 1991, Judge Rodriguez denied their motion. After additional discovery was permitted, defendant Town Liquors moved for summary judgment. In October of 1991, the case was reassigned to Judge William G. Bassler. The defendant police officers and City made their second motion for summary judgment. On July 27, 1992, Judge Bassler granted summary judgment in favor of defendant Town Liquors. On July 30, 1992, he granted summary judgment in favor of the police officers and City. See Fagan v. City of Vineland, 804 F.Supp. 591 (D.N.J.1992). Plaintiffs filed these appeals.
 
 
 14
 The district court had jurisdiction over the federal claims under 28 U.S.C. Secs. 1331 and 1343(a)(3) and pendent jurisdiction over the state claims. We have jurisdiction under 28 U.S.C. Sec. 1291.
 
 II.
 DISCUSSION
 A.
 
 15
 When this appeal came before the original panel, plaintiffs argued that the law of the case doctrine precluded the district court from considering the defendants' motion for summary judgment on the Fourteenth Amendment substantive due process claim because the previously assigned district judge had denied defendants' motion for summary judgment; that the district court erred in determining that the applicable standard of review for Fourteenth Amendment substantive due process claims is the "shock the conscience" test rather than the reckless or callous indifference test; that the district court erred as a matter of law in concluding that the City of Vineland and its policymakers could not be liable on the failure to train claim under section 1983 if the conduct of the pursuing police officers did not constitute a Fourteenth Amendment violation; that the unavailability of a state remedy precluded the district court from granting defendants' motion for summary judgment, and that the district court erred in granting the defendant Town Liquor's motion for summary judgment on plaintiffs' state law negligence claim.
 
 
 16
 The original panel unanimously held that the law of the case doctrine was inapplicable, that the City may be independently liable for violating the plaintiffs' constitutional rights even if no individual police officer is liable, that the absence of a state remedy has no effect on plaintiffs' rights under the Due Process Clause, and that the record contained insufficient evidence to show that defendant Town Liquors proximately caused the accident, thereby affirming the district court's grant of summary judgment on that claim. The panel, however, divided on the "central issue" of the standard for liability under section 1983 for a substantive due process violation in a police pursuit case, with the majority holding that the applicable standard is whether the police officers acted with a reckless indifference to public safety, whereas the dissent took the position that substantive due process is violated only by conduct which "shocks the conscience."
 
 
 17
 The City of Vineland and the defendant police officers filed a Petition for Rehearing in Banc limited to the question of the appropriate standard to be applied in police pursuit cases alleging a violation of substantive due process. The court granted rehearing in banc and, pursuant to our Internal Operating Procedures, vacated the panel's opinion. See Internal Op.Pr. 9.5.9 (July 1990). The in banc court limited its consideration to the one issue raised in the petition for rehearing, which is the subject of this opinion. Accordingly, the panel opinion on all the other issues, edited to conform to the new in banc result, is being filed contemporaneously with this opinion.
 
 B.
 
 18
 In granting summary judgment for the defendants on plaintiffs' section 1983 claim, the district court stated that "[a] review of case law indicates that, in cases involving police pursuits, most courts have applied something akin to the shocks-the-conscience test." Fagan, 804 F.Supp. at 601. The court concluded that while the three deaths and injuries were terrible and shocking, "[n]othing about any of this police conduct--neither the decision to pursue, nor the manner of pursuit--shocks the conscience." Id. at 605.
 
 
 19
 Plaintiffs argue in essence that the district court applied the wrong standard to their substantive due process claims. They recognize that this court has not yet set forth a standard for Fourteenth Amendment substantive due process claims in police pursuit matters, but argue that the appropriate standard of review should be reckless or callous indifference. Arguably, if that were the appropriate standard, plaintiffs may have been able to withstand the defendants' motion for summary judgment. Plaintiffs rely primarily on the testimony of their expert witness, Dr. Territo, to support their argument that the defendants acted recklessly, and Dr. Territo relied, in turn, principally on the police pursuit guidelines promulgated in New Jersey by its Attorney General.
 
 
 20
 It is significant, however, that under the guidelines "law enforcement officers continue to be afforded a wide latitude of discretion in individual cases." Guidelines at 1; Plaintiffs' App. at 2. Further, while the guidelines state that non-hazardous violations never warrant prolonged or high speed pursuit, it is far from clear that this category applied to Pindale's conduct. The illustrations of "non-hazardous violations" are technical infractions like registration violations, rather than violations which indicate a potential for immediate danger, such as a driver losing control of his passengers.
 
 
 21
 Indeed, Jeffrey Pindale's continued operation of the Camaro at high speed without his lights while passing through additional stop signs also takes him out of the guideline for a "non-continual violation," which is applicable "[w]here the danger has passed." Guidelines at 5; Plaintiffs' App. at 6. Thus, the officers probably fell within the final sentence of that paragraph which provides that the "responsible discretion of the police officer is relied on very heavily." Id. Once Jeffrey Pindale had turned off his lights while driving 40 miles per hour in a residential neighborhood, Tesoroni could have reasonably believed, as he testified, that Pindale "was a substantial risk to the community" and demonstrated "a willful and wanton disregard for the value of human life as well as property." Plaintiffs' App. at 26.
 
 
 22
 As the district court noted "[t]he tenor of Territo's testimony is that the officers thought through their actions, but came to the wrong conclusion under the police pursuit guidelines." 804 F.Supp. at 605. Given the facts, it is not clear that we could hold that as a matter of law the decision to initiate and continue pursuit could be found by any reasonable jury to be recklessly indifferent.[2] We need not decide that issue because we conclude that the appropriate standard by which to judge the police conduct is the "shocks the conscience" standard, and we note that plaintiffs did not claim in their brief that they have produced facts sufficient to withstand a summary judgment motion under that test.
 
 C.
 
 23
 It is true that with the exception of one recent case, the opinions of this court have routinely used reckless indifference as the standard by which the courts should determine whether the conduct of police or other governmental employees violates the Due Process Clause of the Constitution. Nonetheless, the question before us is whether the Supreme Court's decision in Collins v. City of Harker Heights, --- U.S. ----, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), has now redefined or at least clarified the relevant inquiry when plaintiffs rely on substantive due process as the basis of the constitutional tort.
 
 
 24
 Reexamination of our reckless indifference standard in light of Collins leads us to conclude that the substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that "shocks the conscience." See Collins, at ----, 112 S.Ct. at 1069; see also Temkin v. Frederick County Comm'rs, 945 F.2d 716, 720 (4th Cir.1991) (applying "shocks the conscience" standard in police pursuit case), cert. denied, --- U.S. ----, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992); Checki v. Webb, 785 F.2d 534, 538 (5th Cir.1986) (same).
 
 
 25
 In our first post-Collins opinion, this court applied the "shocks the conscience" test and explained that our earlier cases applying a different test all involved alleged violations of a "well-established constitutional right," such as a student's right to be free from sexual abuse or the use of excessive force by a school teacher, or a prisoner's liberty interest in protection from attacks by other prisoners. Searles v. Southeastern Pa. Transp. Auth., 990 F.2d 789, 794 (3d Cir.1993).
 
 
 26
 The words "shocks the conscience" first appeared in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), where the Supreme Court held that the Due Process Clause barred the admission of evidence at a criminal trial that had been obtained by forcibly subjecting the defendant to a stomach pump. Id. at 172-73, 72 S.Ct. at 209-10. The Court concluded that this police conduct was so egregious as to "shock[ ] the conscience," id. at 172, 72 S.Ct. at 209, and "offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." Id. at 169, 72 S.Ct. at 208 (quoting Malinski v. New York, 324 U.S. 401, 417, 65 S.Ct. 781, 789, 89 L.Ed. 1029 (1945)).
 
 
 27
 In Collins, which represents the Supreme Court's most recent pronouncement on substantive due process as applied in a civil damage action, the Court unanimously reaffirmed the viability of the "shocks the conscience" standard. The plaintiff in Collins alleged that the city followed a custom and policy of deliberate indifference toward the safety of its workers by "not training its employees about the dangers of working in sewer lines and manholes, not providing safety equipment at job sites, and not providing safety warnings." --- U.S. at ----, 112 S.Ct. at 1064. The Court reasoned that the plaintiff had advanced two theories of recovery:
 
 
 28
 that the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety and security in the workplace, or that the city's "deliberate indifference" to Collins' safety was arbitrary Government action that must "shock the conscience" of federal judges.
 
 
 29
 Id. at ----, 112 S.Ct. at 1069 (citing Rochin, 342 U.S. at 172, 72 S.Ct. at 209). The Court rejected the plaintiff's contention that the city had a federal constitutional obligation to provide its employees with certain minimal levels of safety, characterizing that position as "unprecedented" and supported by "[n]either the text nor the history of the Due Process Clause." Id. The Court also gave short shrift to the plaintiff's second theory of liability, as to which it stated, "We also are not persuaded that the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary,[3] or conscience-shocking, in a constitutional sense." Id. --- U.S. at ----, 112 S.Ct. at 1070 (emphasis added).
 
 
 30
 In Searles, a panel of this court followed Collins in considering the plaintiffs' substantive due process claim as the basis for recovery for injuries arising out of a subway derailment. The court rejected the plaintiffs' arguments that "the Constitution imposes a duty on a municipal transit authority to provide its passengers with minimal levels of safety and security during transportation, or that the transit authority's deliberate indifference to decedent's safety was arbitrary government action that must shock the conscience of federal judges." Searles, 990 F.2d at 792.
 
 
 31
 We reject any attempt to confine the scope of Collins to those situations where the government failed to take any action to eliminate dangerous conditions. Instead we believe that in enunciating the "shocks the conscience" standard, the Supreme Court intended no distinction between application of the "shocks the conscience" test in situations where the government officials' affirmative act is the direct cause of the constitutional harm and those where the harm is caused by governmental omission. See White v. Rochford, 592 F.2d 381, 384 (7th Cir.1979) (Opinion of Sprecher, J., announcing the judgment of the court) ("it seems incongruous to suggest that [substantive due process] liability should turn on the tenuous metaphysical construct which differentiates sins of omission and commission"). Indeed, the stomach pump found so reprehensible by the Court in Rochin was an affirmative act committed by state officials, as was the involuntary blood alcohol test in Breithaupt v. Abram, 352 U.S. 432, 435-37, 77 S.Ct. 408, 410-12, 1 L.Ed.2d 448 (1957), and the government's motion to detain a defendant before trial under the Bail Reform Act of 1984, see United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). Yet in each of these cases, the Court applied the "shocks the conscience" standard to evaluate the alleged substantive due process violation.[4]
 
 
 32
 Numerous courts of appeals have also applied the "shocks the conscience" standard when presented with substantive due process challenges involving affirmative government actions. See, e.g., Feliciano v. City of Cleveland, 988 F.2d 649, 657 (6th Cir.) (subjecting police academy cadets to surprise urinalysis to detect drugs), cert. denied, --- U.S. ----, 114 S.Ct. 90, 126 L.Ed.2d 57 (1993); Newell v. Brown, 981 F.2d 880, 886 (6th Cir.1992) (transferring prisoner to high security prison based on letter written by Congressman at behest of victim's daughter), cert. denied, --- U.S. ----, 114 S.Ct. 127, 126 L.Ed.2d 91 (1993); Salas v. Carpenter, 980 F.2d 299, 302-03, 309 (5th Cir.1992) (county sheriff's replacement of trained SWAT and hostage negotiation teams with untrained police officers resulting in death of hostage); Oladeinde v. City of Birmingham, 963 F.2d 1481, 1483, 1486 (11th Cir.1992) (police officials' retaliation against officers for whistleblowing about wrongdoing in the police department), cert. denied, --- U.S. ----, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993); Spear v. Town of West Hartford, 954 F.2d 63, 68 (2d Cir.) (city's filing suit against newspaper editor for publishing editorial concerning anti-abortion protest), cert. denied, --- U.S. ----, 113 S.Ct. 66-67, 121 L.Ed.2d 33 (1992); Pittsley v. Warish, 927 F.2d 3, 6-7 (1st Cir.) (police officers' verbal abuse and threats against live-in companion of arrestee and her children), cert. denied, --- U.S. ----, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991); Reese v. Kennedy, 865 F.2d 186, 187-88 (8th Cir.1989) (police officers' forced eviction of plaintiff from her home); see also Black v. Stephens, 662 F.2d 181, 188 (3d Cir.1981) (in excessive force cases, "[t]he test under the due process clause is whether the police officer's conduct 'shocks the conscience' "), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982).[5]
 
 
 33
 Although the applicability of the "shocks the conscience" standard to affirmative acts by government officials is well settled, courts have also looked to the requisite mental state that those officials must possess in order to constitutionalize an otherwise ordinary state-law tort. The Supreme Court has thus far held that mere negligence is insufficient to trigger constitutional liability. See Davidson v. Cannon, 474 U.S. 344, 347-48, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986) ("lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent"). However, it has expressly declined to decide "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." Daniels v. Williams, 474 U.S. 327, 334 n. 3, 106 S.Ct. 662, 666 n. 3, 88 L.Ed.2d 662 (1986).
 
 
 34
 After Daniels, many courts of appeals have determined that a reckless or even a grossly negligent act is actionable under the Due Process Clause. See, e.g., Medina v. City and County of Denver, 960 F.2d 1493, 1496 (10th Cir.1992) (applying recklessness standard to police pursuit); Germany v. Vance, 868 F.2d 9, 11, 18 (1st Cir.1989) (applying recklessness standard to Department of Youth caseworker's failure to inform plaintiff of falsified evidence leading to her delinquency adjudication); Archie v. City of Racine, 847 F.2d 1211, 1219 (7th Cir.1988) (en banc) (applying recklessness standard to fire department dispatcher's failure to provide rescue services for woman who subsequently died), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989); Nishiyama v. Dickson County, 814 F.2d 277, 282 (6th Cir.1987) (en banc) (applying gross negligence standard to police official's decision to entrust fully equipped patrol car to inmate who then killed innocent bystander); see also Roach v. City of Fredericktown, 882 F.2d 294, 297 (8th Cir.1989) (gross negligence insufficient in police pursuit case); Cannon v. Taylor, 782 F.2d 947, 950 (11th Cir.1986) (same).
 
 
 35
 There is regrettably scarce authority in case law and little academic writing that attempts to reconcile the "shocks the conscience" test with the reckless disregard/gross negligence inquiry. It is significant that our cases applying the reckless disregard standard appear to be limited to cases where the victim was in custody. See, e.g., Williams v. Borough of West Chester, 891 F.2d 458, 464 & n. 10 (3d Cir.1989). That threshold of liability is appropriate in custody cases because the government has restricted an individual's liberty and thereby increased his or her vulnerability to abusive governmental action or to private harm. Although we have not articulated the issue in this way, it can fairly be said that the judicial conscience is shocked by a governmental employee's reckless disregard of the constitutional rights of an individual in custody.
 
 
 36
 The custody cases are not analogous for this purpose to the police pursuit cases. See Temkin, 945 F.2d at 721 ("the standard of care owed in the context of incarceration is of limited value [in police pursuit cases]"); cf. Medina, 960 F.2d at 1496 (characterizing Temkin as holding that "reckless conduct in police chase cases must 'shock the conscience' to be actionable"); Richard H. Fallon, Jr., Some Confusions About Due Process, Judicial Review, and Constitutional Remedies, 93 Colum.L.Rev. 309, 324 (1993) ("no agreed framework has emerged for identifying when relatively isolated official acts offend substantive due process," although "[t]he Court has established that conscience-shocking action violates due process").
 
 
 37
 The Fifth Circuit has provided a clear explanation of the inadequacy of using an exclusively intent-based inquiry to ground liability under the Due Process Clause:
 
 
 38
 Many courts have simply applied common law tort principles to the concept of abuse of government power holding that, while simple negligence is not actionable under Sec. 1983, gross negligence, recklessness, callous indifference or intentional conduct are.... While terms applicable to common law torts may help to determine what type of conduct constitutes abuse of power, use of such terms can be misleading. See Rankin [v. City of Witchita Falls], 762 F.2d [444, 447-48 (5th Cir.1985) ] ("some degree of government fault is necessary ... [but] to predicate liability under section 1983 totally on the mere degree of fault would be to convert the due process clause into an ordinary tort statute"). Such terms state only a standard of care. They do not take into account the exact responsibilities of a particular official or his power to take certain actions. Moreover, it does not take into account the nature and types of discretion which different government officials must be allowed to exercise if they are to have the freedom to carry out their duties without undue interference.
 
 
 39
 Love v. King, 784 F.2d 708, 713 (5th Cir.1986); see also 1 Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983 Sec. 3.10, at 182 (3d ed. 1991) (citing analysis in Love with approval).
 
 
 40
 In light of the Supreme Court's unanimous adherence to the "shocks the conscience" test in Collins, the reckless indifference of government employees is an insufficient basis upon which to ground their liability for a police pursuit under the Due Process Clause.[6] Such an inquiry is grounded in tort law, not in constitutional principles.[7] As we stated in our earlier in banc opinion in Davidson v. O'Lone, 752 F.2d 817 (3d Cir.1984), aff'd sub nom., Davidson v. Cannon, 471 U.S. 1134, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985), "where a person suffers injury as an incidental and unintended consequence of official action, the abuse of power contemplated in the due process and [eighth] amendment cases does not arise." Id. at 827 (quoting Rhodes v. Robinson, 612 F.2d 766, 772 (3d Cir.1979)).
 
 
 41
 This case has been briefed and argued in this court on the basis of the plaintiffs' contention that the police officers were guilty of reckless conduct in conducting the pursuit of Pindale's automobile. The dissent, without any basis in the pleadings or in the record, has chosen to magnify their culpability, equating what it characterizes as "reckless police conduct in this case," Dissenting Op. at 1324, to arbitrary, intentional, and deliberate governmental action. The plaintiffs failed to introduce evidence of that nature. The only evidence they introduced on the issue, the testimony of their expert witness, expressly disclaimed any such characterization. Indeed, Dr. Territo testified that the officers did take into account the relevant factors, i.e. that Pindale was engaged in a continuing violation, their knowledge of the streets involved, the fact that it was a residential area, their knowledge of the traffic conditions at the time and place of the events and their own ability to operate their own vehicles. App. at 185.
 
 He then gave the following answers:
 
 42
 Q. And you're not saying that they didn't consider these factors, you're just saying they came out to the wrong decision?
 
 
 43
 A. That's correct.
 
 
 44
 Q. And the wrong decision was they either decided to pursue or to continue to pursue when they shouldn't have?
 
 
 45
 A. That's correct.
 
 
 46
 Q. You're not saying that their decision was arbitrary?
 
 
 47
 A. No. I think it was a premeditated decision. I think they thought through what they wanted to do and did it.
 
 
 48
 Q. That is to say you recognize that they thought through the situation, they considered the factors such as we have just discussed, but they came to the wrong decision, in your opinion?
 
 
 49
 A. Probably so.
 
 
 50
 App. at 185-86.
 
 
 51
 The facts of this case are analogous to those considered by the Fourth Circuit in Temkin, where the court, applying the "shocks the conscience" test to a police pursuit, refused to find a substantive due process violation. In that case, a police officer who observed a car spinning its wheels as it left a gas station pursued the vehicle with its lights and sirens activated. Although the officer was informed during the course of the ensuing chase that the driver had stolen $17.00 worth of gas from the station, the pursuit reached speeds ranging from 65 to 105 miles per hour over "a narrow, two-lane highway traversing an area of varying population," which ended when both drivers lost control over their vehicles, causing the plaintiff "severe and permanent injuries." 945 F.2d at 718.
 
 
 52
 At the time of the accident, a policy of the county Sheriff's Department governing police pursuits required the supervisor on duty to monitor all pursuits and to terminate them if warranted. The supervisor, who could not monitor this pursuit for legitimate reasons, failed to keep apprised of the officer's actions from the radio of an accompanying officer. See id.
 
 
 53
 The court of appeals affirmed the grant of summary judgment in favor of the officers, rejecting the plaintiffs' contention that the following facts demonstrated conduct violative of the applicable standard of care:
 
 
 54
 1) the chase continued for a significant period of time over a ten mile area; 2) the chase continued at a very high rate of speed; 3) the chase was initiated because of a minor violation; 4) the police already had, at a minimum, a partial identification of the license plate of the suspect vehicle; and 5) the chase violated [the pursuit policy] because [the officer] failed to maintain radio contact with his supervisor throughout. To those five facts we would add the expert deposition testimony of [plaintiffs' expert] that [the officer's] conduct was "reckless," "totally irresponsible," and "wanton."
 
 
 55
 Id. at 723. The court characterized the officer's conduct as "disturbing and lacking in judgment" but not shocking to the conscience. Id.
 
 
 56
 Our holding today is also in accord with the Fifth Circuit's opinion in Checki, which stated that the action of an unmarked police car in tailgating a driver who had accelerated to speeds in excess of 100 miles per hour in response to the police's approach would not alone raise any substantive due process claims. In Checki however, the court declined to grant defendants summary judgment because when, after the car was finally stopped at a roadblock, one of the pursuing officers struck Checki with his revolver and broke his companion's arm. In its discussion, the court applied the standard we adopt here, stating that "where a police officer uses a police vehicle to terrorize a civilian, and he has done so with malicious abuse of official power shocking the conscience, a court may conclude that the officers have crossed the 'constitutional line.' " 785 F.2d at 538.
 
 
 57
 The Sixth Circuit appears to apply the same test, albeit under the gross negligence rubric. In Jones v. Sherrill, 827 F.2d 1102 (6th Cir.1987), police officers spotted Sherrill's car being driven in an unsafe manner. When they tried to stop the vehicle, Sherrill fled, initiating a pursuit involving speeds up to 135 miles per hour in city traffic. The chase ended when Sherrill's car crossed the center line and collided with Jones' car, causing Jones' death. The court, applying what it called a "gross negligence" test, found that these facts "were not sufficient to charge the government officials with outrageous conduct or arbitrary use of government power" necessary to state a claim because the officers' intent in initiating the chase was "to protect public safety." Id. at 1106-07.[8]
 
 
 58
 Although we are aware of the amorphous and imprecise inquiry that the "shocks the conscience" test entails (referred to in Rochin itself as "indefinite and vague," 342 U.S. at 172, 72 S.Ct. at 209), it is the standard recently reaffirmed by a unanimous Supreme Court which we are bound to follow.[9] Therefore, we will affirm the district court's grant of summary judgment for the defendant officers under the "shocks the conscience" standard.
 
 
 59
 COWEN, Circuit Judge, with whom BECKER, SCIRICA and LEWIS, Circuit Judges, join, dissenting.
 
 
 60
 Table of Contents
 I. Introduction ....................................................... 1309
 II. The "Shocks the Conscience" Standard ............................... 1311
 A. The Collins Case as the Authority ............................ 1311
 B. The Majority's Remaining Analysis ............................ 1313
 C. The Inappropriateness of the "Shocks the Conscience" Test .... 1316
 1. The Debut and Erosion of the Rochin Case ............... 1316
 2. The Mistaken Extension of the "Shocks the Conscience" .. 1318
 3. The Impracticality of the "Shocks the Conscience" Test . 1319
III. The Reckless Indifference Standard ................................. 1320
 A. The Supreme Court's Elaboration of Due Process Law ........... 1321
 B. Reckless Indifference as the Standard ........................ 1322
 1. The Exercise of Exclusively Governmental Power ......... 1322
 2. Reckless Indifference as Intentional or Arbitrary
 Conduct .............................................. 1323
 3. Prudential Concerns .................................... 1326
 C. Consistency with Case Law .................................... 1326
 IV. The Majority's Assessment of the Facts ............................. 1328
 V. Conclusion ......................................................... 1328
----------
 
 
 61
 Today the in banc majority holds that in a Sec. 1983 action for violation of substantive due process "the appropriate standard by which to judge the police conduct is the 'shocks the conscience' standard," Maj.Op. at 1303. The majority acknowledges, as it must, that such a test at its best is "amorphous and imprecise." Id. at 1308. The in banc majority fails to explain why the utterly reckless indifference to the safety of the public exhibited by the police officers in conducting the high speed car chase in this case, which resulted in the death of three people and crippling injuries for two others, does not suffice to constitute a deprivation in the constitutional sense. Nor does it provide an analysis as to why conduct that meets the amorphous and imprecise "shocks the conscience" test is the necessary condition for establishing a violation of substantive due process.
 
 
 62
 The in banc majority mainly relies upon the authority of Collins v. City of Harker Heights, --- U.S. ----, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), for its holding. From its reading of Collins, the in banc majority of our court concludes that the "shocks the conscience" test is "the standard recently reaffirmed by a unanimous Supreme Court which we are bound to follow." Maj.Op. at 1308.
 
 
 63
 The in banc majority misreads Collins by attributing to the decision the adherence to a "shocks the conscience" standard, which adherence is not in the opinion of the Supreme Court. The misplaced reliance aside, I disagree with the proposition that "conscience-shocking" conduct is the only conduct that constitutes an unconstitutional deprivation, although I agree that conduct which "shocks the conscience" suffices to satisfy (and more than satisfies) any constitutional standard whereby a deprivation can be found. I would hold that the appropriate standard is reckless indifference, and therefore respectfully dissent.
 
 I. Introduction
 
 64
 The plaintiffs brought this instant action under 42 U.S.C. Sec. 1983. That provision states:
 
 
 65
 Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 66
 42 U.S.C. Sec. 1983 (1988). Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred." Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694-95 n. 3, 61 L.Ed.2d 433 (1979). The plaintiffs in this case ground their claim on the substantive component of the Due Process Clause of the Fourteenth Amendment.
 
 
 67
 The Due Process Clause provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Case law indicates that to prevail in a case brought under Sec. 1983 for violations of the Due Process Clause, the plaintiff must show that the defendant acted under color of state law, Monroe v. Pape, 365 U.S. 167, 172-87, 81 S.Ct. 473, 476-84, 5 L.Ed.2d 492 (1961), that at stake was a protected property interest or a liberty interest, Board of Regents v. Roth, 408 U.S. 564, 570-78, 92 S.Ct. 2701, 2705-10, 33 L.Ed.2d 548 (1972); Paul v. Davis, 424 U.S. 693, 710-12, 96 S.Ct. 1155, 1165-66, 47 L.Ed.2d 405 (1976), that the defendant had a duty of care toward the plaintiff, Collins v. City of Harker Heights, --- U.S. ----, ----, 112 S.Ct. 1061, 1068-71, 117 L.Ed.2d 261 (1992); DeShaney v. Winnebago County Dept. of Social Serv., 489 U.S. 189, 194-203, 109 S.Ct. 998, 1002-1007, 103 L.Ed.2d 249 (1989), and that a deprivation within the meaning of the Due Process Clause occurred, Daniels v. Williams, 474 U.S. 327, 329-33, 106 S.Ct. 662, 664-66, 88 L.Ed.2d 662 (1986).
 
 
 68
 Whether an unconstitutional deprivation occurred is the only element at issue in this case. It is important for us to keep this fact in mind so that we will not confuse cases addressing other elements such as the existence of a constitutional duty with the case sub judice. Our task is to adopt a standard with which the courts can adjudicate whether the challenged conduct constitutes an unconstitutional deprivation.
 
 
 69
 Although what is a deprivation within the meaning of the Due Process Clause appears to defy definition across the board, in the seminal case of Monroe v. Pape, the Supreme Court directed that Sec. 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his action." 365 U.S. at 187, 81 S.Ct. at 484. Clearer pronouncement came when the Court stated that "[n]othing in the language of Sec. 1983 or its legislative history limits the statute solely to intentional deprivations of constitutional rights," Parratt v. Taylor, 451 U.S. 527, 534, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), and that Sec. 1983 "affords a 'civil remedy' for deprivations of federally protected rights caused by persons acting under color of state law without any express requirement of a particular state of mind," id. at 535, 101 S.Ct. at 1913. On the contrary, the criminal counterpart to Sec. 1983, 18 U.S.C. Sec. 242, specifically contains a wilfulness, i.e., intentional conduct, requirement in its language. Id.
 
 
 70
 The Supreme Court has steadfastly adhered to the position that Sec. 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." Daniels, 474 U.S. at 330, 106 S.Ct. at 664 (1986). The plaintiff need only prove a violation of the underlying constitutional right. Id.
 
 
 71
 However, the Court's holding in Parratt appeared to state that negligent conduct may be sufficient to state a claim under Sec. 1983 for a violation of the Due Process Clause under the 14th Amendment. Concerned that an expansive reading of Sec. 1983 and the Due Process Clause would make the 14th Amendment " 'a font of tort law to be superimposed upon whatever systems may already be administered by the States,' " Daniels, 474 U.S. at 332, 106 S.Ct. at 665 (quoting Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976)), the Supreme Court retreated somewhat, and "overrule[d] Parratt to the extent that it states that mere lack of due care by a state official may 'deprive' an individual of life, liberty, or property under the Fourteenth Amendment." Daniels, 474 U.S. at 331, 106 S.Ct. at 664.
 
 
 72
 It is thus clear that an intentional violation of a right protected by the Due Process Clause is within the reach of Sec. 1983. It is also clear that mere negligence is insufficient to make out a claim. What is unclear is the status of the claims arising from conduct falling within the spectrum between mere negligence and intentional conduct. In Daniels the Supreme Court reserved the question "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." Id. at 334 n. 3, 106 S.Ct. at 666 n. 3. Accordingly, the standard by which to determine whether the arguably reckless police conduct in this case worked a deprivation in violation of substantive due process has thus far been an open question.
 
 II. The "Shocks the Conscience" Standard
 
 73
 To this open question, the "shocks the conscience" test is the answer of the in banc majority. Without providing an analysis as to why "shocks the conscience" conduct is a necessary requirement for a violation of substantive due process, the in banc majority primarily relies on Collins v. City of Harker Heights, --- U.S. ----, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), as its marching order. I disagree.
 
 A. The Collins Case as the Authority
 
 74
 Although frankly recognizing that with one exception this court has so far "routinely used reckless indifference as the standard by which the courts should determine whether the conduct of police or other governmental employees violates the Due Process Clause," Maj.Op. at 1303, the in banc majority abruptly concludes that higher authority has now compelled us to adopt the "shocks the conscience" standard. I do not see such higher authority.
 
 
 75
 The in banc majority characterized the question before us as "whether the Supreme Court's decision in Collins v. City of Harker Heights, --- U.S. ----, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), has now redefined or at least clarified the relevant inquiry when plaintiffs rely on substantive due process as the basis of the constitutional tort." Maj.Op. at 1303. Collins is seen by the in banc majority as "represent[ing] the Supreme Court's most recent pronouncement on substantive due process as applied in a civil damage action," id. at 1304, where "the Court unanimously reaffirmed the viability of the 'shocks the conscience' standard." Id. (emphasis added). The natural conclusion drawn by the in banc majority is that the "shocks the conscience" test "is the standard recently reaffirmed by a unanimous Supreme Court which we are bound to follow." Id. at 1308.
 
 
 76
 The in banc majority reads too much into Collins and its reliance upon Collins is totally misplaced. The Supreme Court has never established a "shocks the conscience" test in a Sec. 1983 action. This is clear because the catch phrase "shocks the conscience" was first employed in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (before the Fourth Amendment was incorporated into the Fourteenth Amendment, see Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)), a criminal case decided in 1952 relating to the exclusion of certain evidence, while in 1986 the Supreme Court reserved the question "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." Daniels, 474 U.S. at 334 n. 3, 106 S.Ct. at 666 n. 3. Obviously the Supreme Court did not believe Rochin foreclosed this question. Nor did the Supreme Court establish any such "shocks the conscience" test between the time it decided Daniels and when Collins was announced in 1992. Therefore, there was no precedent for any "shocks the conscience" test in a Sec. 1983 case for the Supreme Court to pay homage to, or to apply any "unanimous adherence" or "unanimous reaffirmance" to in Collins.
 
 
 77
 Nor did the Collins case establish a "shocks the conscience" test. It merely rejected the arguments that "the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety and security in the workplace," Collins, --- U.S. at ----, 112 S.Ct. at 1069, and that "the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense," id. at ----, 112 S.Ct. at 1070. The focus of that case is on the lack of a constitutional duty on the part of the city to make its workplace safe, for without such a duty there cannot be a claim under Sec. 1983 against the city for a violation of substantive due process. See DeShaney, 489 U.S. at 194-203, 109 S.Ct. at 1002-07; D.R. by L.R. v. Middle Bucks Area Vocat'l Tech. School, 972 F.2d 1364, 1368-76 (3d Cir.1992) (in banc), cert. denied, --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993). There was no need in Collins to establish any test to gauge what is a deprivation under the Fourteenth Amendment.
 
 
 78
 Furthermore, the Collins Court characterized the city's conduct as a mere omission, --- U.S. at ----, 112 S.Ct. at 1070, and thus falling within the rule of Daniels. There was no occasion for the Collins Court to consider the implication of conduct that shocks the conscience. Indeed, there was no need to provide a new rule regarding conduct that is more culpable than mere omission. Significantly, the Court emphasized that the plaintiff "[did] not claim that the city or any of its agents deliberately harmed her husband. In fact, she [did] not even allege that his supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured." Id. at ----, 112 S.Ct. at 1069. This language apparently addressed the question of reckless conduct and affirmative governmental action, thus indicating that the Court attempted to restrict its holding to the "mere omission" factual scenario. Should reckless conduct exist, the Supreme Court may rule differently.
 
 
 79
 The entire text of the Collins opinion used the phrase "shock the conscience" only once, and it was used to characterize the plaintiff's contention. Id. The phrase "conscience-shocking" also appeared only once. When the term was used, it was not used exclusively, but placed together with "arbitrary." Id. at ----, 112 S.Ct. at 1070. The Court stated that "the city's alleged failure ... was an omission that can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." Id. (emphasis added). This language indicates at a minimum that either conduct that "shocks the conscience" or "arbitrary" conduct would suffice to state a claim under the Due Process Clause and that no exclusive "shocks the conscience" standard was announced.
 
 
 80
 More important, the Court in other sections of the opinion apparently used "arbitrariness" as the standard. Id. at ---- - ----, 112 S.Ct. at 1070-71. The Court explained that its "refusal to characterize the city's alleged omission in [the] case as arbitrary in a constitutional sense rests upon the presumption that the administration of Government programs is based on a rational decisionmaking process." Id. at ----, 112 S.Ct. at 1070 (emphasis added). Then the Court proceeded to dismiss the plaintiff's claim of deprivation of a liberty interest allegedly created by Texas state law for the reason that "she has not alleged that the deprivation of this liberty interest was arbitrary in the constitutional sense." Id. at ----, 112 S.Ct. at 1071 (emphasis added). The Court summarized its holding in a previous section as "the city's alleged failure to train and warn did not constitute a constitutionally arbitrary deprivation of Collins' life." Id. (emphasis added). In all these instances, only the term "arbitrary" was used. If the Court's opinion is an indication of any standard, that standard appears to be "arbitrariness." Thus, Collins obviously does not foreclose a court from considering "arbitrary" acts as violations of the Due Process Clause. The in banc majority of our court does not explain why reckless indifference does not constitute an arbitrary act in the constitutional sense. It truncates what the Supreme Court said and focuses only on that part of the sentence that used the catch phrase of "conscience-shocking."
 
 
 81
 Moreover, the in banc majority of this court characterized the Supreme Court's treatment of the plaintiff's claim in Collins as giving "short shrift," Maj.Op. at 1304, to the plaintiff's theory of liability. It would be a strange way to establish a new "shocks the conscience" test by "giving short shrift" to the plaintiff's claim.[1] We should not lightly assume that such a methodology is the modus operandi of the Supreme Court in announcing new constitutional standards of such great importance.
 
 
 82
 The author of the Collins opinion, Justice Stevens, might be surprised by the in banc majority's reading of Collins as establishing or fortifying the "shocks the conscience" standard. Justice Stevens does not even endorse the position that mere negligence cannot be a deprivation, not to mention a "shocks the conscience" test. In both Daniels and its companion case Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), Justice Stevens did not join the opinion of the Court, while concurring in the judgments. Justice Stevens disagreed with the majority on the issue of what is a deprivation:
 
 
 83
 "Deprivation," it seems to me, identifies, not the actor's state of mind, but the victim's infringement or loss. The harm to a prisoner is the same whether a pillow is left on a stair negligently, recklessly, or intentionally; so too, the harm resulting to a prisoner from an attack is the same whether his request for protection is ignored negligently, recklessly, or deliberately. In each instance, the prisoner is losing--being "deprived" of--an aspect of liberty as the result, in part, of a form of state action.
 
 
 84
 Daniels v. Williams, 474 U.S. 327, 341, 106 S.Ct. 677, 680, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring in judgment in Daniels and Davidson ) (emphasis added). Thus, the author of the Collins opinion had clearly indicated in another context that reckless as well as negligent conduct would work a deprivation.
 
 
 85
 For the foregoing reasons, the in banc majority errs in relying on Collins as the authority for today's holding. The Collins case did not establish any "shocks the conscience" test that "we are bound to follow," Maj.Op. at 1308.
 
 B. The Majority's Remaining Analysis
 
 86
 Stripped of its misplaced reliance upon higher authority, the in banc majority of course may still of its own volition establish "the shocks the conscience test" for this circuit. Without the compulsion that follows from Supreme Court authority, it is incumbent upon the in banc majority to provide an independent analysis to directly establish the "shocks the conscience" standard as the necessary standard. Such an inquiry is particularly important in this case. As the in banc majority acknowledges, this court has so far with the exception of one recent case "routinely used reckless indifference as the standard by which the courts should determine whether the conduct of police or other governmental employees violates the Due Process Clause," Maj.Op. at 1303. Only the most convincing analysis can justify a break from so firm a "routine," lest we send a message that stare decisis means little in our court.[2]
 
 
 87
 I do not find any such searching analysis in the opinion of the in banc majority. The majority appears to rely on Searles v. Southeastern Pennsylvania Transportation Authority, 990 F.2d 789 (3d Cir.1993). This reliance is misplaced for the same reason why the reliance on Collins is misplaced; Searles is a near copy of Collins as to both the factual scenarios and the analysis.
 
 
 88
 In Searles, a train passenger was killed after a motor fell from the bottom of a moving rail car and caused a collision. We rejected the plaintiff's claim because the Constitution imposes no affirmative duty to provide commuters with minimum levels of safety and security, and because "plaintiff's claim is analogous to a fairly typical state law tort claim: defendants breached their duty of care to her husband by failing to provide safe transportation." Id. at 793. As a result, we found no substantive due process violation.
 
 
 89
 The Searles opinion closely followed Collins v. City of Harker Heights which held that the defendant city had not violated the substantive due process rights of an employee who, allegedly because of improper training, was killed by gas while working in a sewer. --- U.S. at ----, 112 S.Ct. at 1069-70. As discussed earlier, the Supreme Court focused on the question whether the city owed a constitutional duty to provide a minimum level of safety in its workplace. See supra at ---- - ----. The Court held that the Constitution imposes no duty to provide a safe working environment. Id. --- U.S. at ---- - ----, 112 S.Ct. at 1069-70. Without such a duty, there was no need to establish any test for the appropriate standard of care.
 
 
 90
 In both Collins and Searles, the government did not directly cause harm to the plaintiffs but instead failed to take action to eliminate dangerous conditions created by an activity of a public builder or employer acting in the same manner as a private one. In the present case, however, the defendant police officers engaged in affirmative conduct by pursuing Pindale at high speeds and attempting to apprehend him. Viewed in the light most favorable to the plaintiffs, the affirmative conduct of the police officers created an extremely dangerous condition. That danger was clear. Under such circumstances, the government has a corresponding duty to protect citizens in proximity to the danger it created. D.R. by L.R. v. Middle Bucks Area Vocat'l Tech. School, 972 F.2d 1364, 1373-76 (3d Cir.1992) (in banc) (duty arising from state created danger), cert. denied, --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993). Both Collins and Searles emphasized that the alleged omissions resembled ordinary state negligence claims. Our case is fundamentally different. The police officers were exercising a core governmental function, and abused that power through their apparently reckless and arbitrary conduct.
 
 
 91
 Secondly, the in banc majority summarily asserts that "the reckless indifference of government employees is an insufficient basis upon which to ground their liability for a police pursuit under the Due Process Clause. Such an inquiry is grounded in tort law, not in constitutional principles." Maj.Op. at 1306-07 (footnotes omitted). Above all, this language indicates that the in banc majority believes there is an inherent conflict between "tort law" and "constitutional principles." This belief is contrary to Supreme Court authority. Even though we are not at liberty to transform every tort claim into a constitutional claim, we have been instructed by the Supreme Court that Sec. 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his action." Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). The in banc majority does not explain why a reckless indifference standard is based solely on tort law, and never on constitutional principles.
 
 
 92
 It appears to me that in order for its position to be persuasive, the in banc majority needs to explain why the "shocks the conscience" test is a necessary standard, and why "reckless indifference" is not a sufficient constitutional standard, on the basis of the text and the tradition of the Constitution, structural inferences legitimately drawn from the Constitution, case law in the Supreme Court or our court, and any other legitimate constitutional considerations. Rather than providing such an analysis, the in banc majority simply quotes from a previous opinion of this court: "where a person suffers injury as an incidental and unintended consequence of official action, the abuse of power contemplated in the due process and [eighth] amendment cases does not arise." Maj.Op. at 1307 (quoting Davidson v. O'Lone, 752 F.2d 817, 827 (3d Cir.1984), aff'd sub nom. Davidson v. Cannon, 471 U.S. 1134, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985)) (alteration in Maj.Op.; citations omitted).
 
 
 93
 I fail to see the reasons why this language is relevant to the question before us, mindful of the fact that Davidson is a case of "mere negligence." If the in banc majority means that the injury that occurred in the case sub judice is "incidental," or that reckless conduct may never produce an injury that is more than incidental so as to trigger the protections of the Due Process Clause, it is in grave error. In my view, injury that results from reckless conduct is not incidental.
 
 
 94
 In an effort to justify its abandonment of our routine application of the reckless disregard standard in constitutional tort cases, the in banc majority points out that the reckless conduct standard has been limited to custody cases, and distinguishes this case solely because no law enforcement custody existed. The in banc majority fails to elaborate on the singular importance of this factor. It merely asserts that "it can fairly be said that the judicial conscience is shocked by a governmental employee's reckless disregard of the constitutional rights of an individual in custody." Maj.Op. at 1306. The in banc majority breaks new ground in making such an assertion. It acknowledges that "we have not articulated the issue in this way." Id. More important, the majority borders on intimating that all of our previous cases can and must be recast to hold that only conduct that "shocks the conscience" can give rise to a cause of action under Sec. 1983 and that the formula is "recklessness plus custody" equals "shocks the conscience."[3]
 
 
 95
 The in banc majority errs in attributing to the fact of custody a function of elevating reckless indifference to conduct that "shocks the conscience." The Supreme Court has indicated that the importance of the fact of custody is that custody gives rise to a duty of care on the part of the custodian toward the detainee: "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v. Winnebago County Dept. of Social Serv., 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005, 109 S.Ct. 998 (1989); Estelle v. Gamble, 429 U.S. 97, 103-05, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976) (deprivation of liberty gives rise to the duty of the government to provide medical care to a prisoner). In these cases, custody was discussed in connection with constitutional "duty," and not in connection with the constitutional standard of care.[4]
 
 
 96
 There is no authority for treating custody as a factor to boost the level of the constitutional standard of care or the gravity of unconstitutional harm. The fact of custody did not affect the Supreme Court's analysis of "mere negligence." Daniels v. Williams, 474 U.S. 327, 329-36, 106 S.Ct. 662, 664-67, 88 L.Ed.2d 662 (1986) (prisoner slipped and fell). In other words, mere negligence plus custody is still mere negligence. I do not believe that recklessness plus custody equals "shocks the conscience."
 
 
 97
 In a footnote the in banc majority alludes to the general reluctance of the federal courts in divining a new cause of action under Sec. 1983 for violations of the Due Process Clause. Maj.Op. at 1306-07 n. 6. This reluctance recognizes the institutional problem of the federal courts deciding tort cases which would inundate the federal courts if there is no gatekeeping. See generally Paul M. Bator et al., Hart & Wechsler's The Federal Courts and the Federal System 1268-77 (3d ed. 1988). However legitimate and salutary, this concern should not be the dispositive factor in our decisionmaking as to whether the Constitution was violated. Each of us has a view of how to solve the problem of docket congestion in the federal courts.[5] However, it is for Congress, not us, to ultimately resolve that question. When a deprivation within the meaning of the Due Process Clause occurs, we have no choice but to recognize a cause of action for compensation. Cf. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 392-97, 91 S.Ct. 1999, 2002-05, 29 L.Ed.2d 619 (1971) (recognizing an implied private right of action for violations of the Fourth Amendment by federal agents in the absence of congressional authorization comparable to Sec. 1983). Moreover, as "inferior federal courts," U.S. Const. art. III, our jurisdiction is regulated by Congress. Id. We are not free to carve out exceptions in the field when Congress by enacting Sec. 1983 has expressly mandated that the federal courts adjudicate such claims.
 
 
 98
 C. The Inappropriateness of the "Shocks the Conscience" Test
 
 
 99
 There is no adequate reason for adopting a "shocks the conscience" test in this case. Even decisions of the Supreme Court have precluded the application of this test in factual situations analogous to those in Rochin. Moreover, Rochin at most states that conduct that "shocks the conscience" suffices, but is not required, to state a claim of constitutional deprivation. In other words, it is a "sufficient" test, not a "necessary" test. Even if the test is valid as a necessary test, it is "amorphous and imprecise," Maj.Op. at 1308, and defies definition. Thus, it is impractical. All these factors militate against adopting a "shocks the conscience" test.
 
 1. The Debut and Erosion of the Rochin Case
 
 100
 The so-called "shocks the conscience" standard was employed by the Supreme Court in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), to impose the Fourth Amendment exclusionary rule upon the states in criminal cases, without overruling a previous decision stating that the Fourth Amendment exclusionary rule does not apply to state proceedings for state crimes. The "shocks the conscience" standard was subsequently repudiated in cases that most closely resembled the facts of the Rochin case. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Graham v. Connor, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). Since Rochin, the Supreme Court has never employed the "shocks the conscience" test as part of its holding in any case. If the test still has any viability, it should be confined to where it arose: criminal cases where the exclusion of evidence is at issue.
 
 
 101
 The catch phrase of "shocks the conscience" is commonly attributed to Rochin, a case in which the question was whether evidence obtained by pumping the defendant's stomach could be introduced to convict the defendant. Id. 342 U.S. at 166-68, 72 S.Ct. at 206-07. This was a fairly easy Fourth Amendment case by today's standards. But the Supreme Court eschewed the Fourth Amendment. See Irvine v. People, 347 U.S. 128, 133, 74 S.Ct. 381, 383, 98 L.Ed. 561 (1953) (plurality opinion) ("Although Rochin raised the search-and-seizure question, this Court studiously avoided it"). Instead, the Court relied upon the Due Process Clause to reverse the conviction. It held that pumping a criminal defendant's stomach to obtain evidence violated his Fourteenth Amendment substantive due process rights and described the state's action as "conduct that shocks the conscience." Id. 342 U.S. at 172, 72 S.Ct. at 209.
 
 
 102
 A perusal of Supreme Court decisions in evidence exclusion cases reveals that in Rochin the Supreme Court did not want to reverse Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), which was decided just three years earlier. Instead, it applied the Due Process Clause as a substitute for the Fourth Amendment in order to exclude evidence obtained through horrendous means. Justice Frankfurter wrote the opinions for the Court in both Rochin and Wolf.
 
 
 103
 In 1914, the Supreme Court held that in a federal prosecution the Fourth Amendment barred the use of evidence secured through an illegal search and seizure. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). This was the advent of the exclusionary rule. In Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the Supreme Court declined to extend this rule to state proceedings on state crimes. In an opinion written by Justice Frankfurter, the Court confessed that it had "no hesitation in saying that were a State affirmatively to sanction such police incursion into privacy [as in this case] it would run counter to the guaranty of the Fourteenth Amendment." Id. at 28, 69 S.Ct. at 1361. However, it held that "in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of the evidence obtained by an unreasonable search and seizure." Id. at 33, 69 S.Ct. at 1364. The reason was that at the time Weeks was decided "the English-speaking world [did] not regard as vital to such protection [of privacy] the exclusion of evidence thus obtained." Id. at 29, 69 S.Ct. at 1362.
 
 
 104
 Permitting the states to admit all evidence indiscriminately went too far when the evidence was obtained by pumping the defendant's stomach. But that was required by the Wolf rule. The Supreme Court's choices were to overrule Wolf or rely on another constitutional protection. It chose the latter in Rochin. Had the Court been willing to extend the exclusionary rule to the states, the Fourth Amendment would have provided a ready answer to the problem. However, the Court opted for the more general Due Process Clause. This was criticized by the Supreme Court itself just one year later in Irvine v. California, 347 U.S. 128, 133, 74 S.Ct. 381, 383, 98 L.Ed. 561 (1953), where the court affirmed a conviction on the authority of Wolf. In Irvine a plurality in an opinion written by Justice Jackson criticized the Rochin Court for failing to address the search-and-seizure issue, and for "never once mention[ing] the Wolf case." Id. (plurality opinion). Justice Clark condemned the Rochin test openly in a concurrence. Id. at 138, 74 S.Ct. at 386 (Clark, J., concurring). Only Justice Frankfurter, joined by Justice Burton, argued that Rochin decided the issue in Irvine. Id. at 145, 74 S.Ct. at 390 (Frankfurter, J., dissenting). Justices Black and Douglas dissented on another ground. See id. at 139-42, 74 S.Ct. at 387-88 (Black, J., dissenting). Thus, according to Justice Black, "[o]nly one thing emerged with complete clarity from the Irvine case--that is that seven Justices rejected the 'shock-the-conscience' constitutional standard." Mapp v. Ohio, 367 U.S. 643, 666, 81 S.Ct. 1684, 1697, 6 L.Ed.2d 1081 (1961) (Black, J., concurring).
 
 
 105
 In 1961 Mapp brought about the final demise of Rochin in evidence exclusion cases. In Mapp, the Court explicitly overruled Wolf and applied the Weeks exclusionary rule to state proceedings. Id. at 650-57, 81 S.Ct. at 1689-92. No Justice opined that Rochin controlled the issue presented in Mapp, that the conduct there did not shock the conscience; therefore, the evidence was admissible. Not even Justice Frankfurter wrote an opinion arguing for the application of the "shocks the conscience" test. He merely joined Justice Harlan's dissent, which contended that it was not an appropriate occasion for reexamining Wolf. Id. at 672-85, 81 S.Ct. at 1701-1708 (Harlan, J., dissenting).
 
 
 106
 The Mapp case "dissipates the doubt and uncertainty in this field [the application of exclusionary rule] of constitutional law." Id. at 666, 81 S.Ct. at 1697 (Black, J., concurring). After Mapp, the defendants need only prove unreasonable search and seizure in order to have evidence excluded in state proceedings. It became irrelevant whether the police conduct in obtaining the evidence at issue "shocks the conscience." The so-called "shocks the conscience" test, which is much harder to satisfy than the reasonableness test, no longer has any bite in evidence exclusion cases.
 
 
 107
 The erosion of Rochin does not stop in criminal cases; it extends to civil cases when a plaintiff brings a Sec. 1983 action alleging police misconduct resembling that in Rochin. The most notable application of Rochin in a civil case is Johnson v. Glick, 481 F.2d 1028, 1033-34 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Accord Black v. Stephens, 662 F.2d 181, 188 (3d Cir.1981), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). The Supreme Court specifically rejected the application of the "shocks the conscience" test in such a context. Graham v. Connor, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). The Court explicitly held that
 
 
 108
 all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.
 
 
 109
 Id. at 395, 109 S.Ct. at 1871. Recently, the Supreme Court reiterated this position in Albright v. Oliver, --- U.S. ----, ---- - ----, 114 S.Ct. 807, 810-814, 127 L.Ed.2d 114 (1994) (plurality opinion).
 
 
 110
 Accordingly, the Supreme Court's decisions in both criminal and civil cases have eliminated the factual basis for the application of the Rochin rule: police misconduct in a search and seizure situation. The Fourth Amendment's reasonableness test is made applicable in both criminal and civil cases in which similar police conduct is at issue. Rochin thus no longer has any relevance in situations analogous to those in Rochin itself; it lasts primarily as a source from which people quote the catch phrase "shocks the conscience."
 
 
 111
 2. The Mistaken Extension of the "Shocks the Conscience"
 
 Test
 
 112
 Even assuming that the Rochin "shocks the conscience" test is still alive and well, and exportable from criminal evidence exclusion cases to Sec. 1983 cases, it still does not support the in banc majority's holding today. Serious flaws exist in the majority's reasoning.
 
 
 113
 First, Rochin only stated that conduct that shocks the conscience renders evidence inadmissible. It never held that only that kind of conduct suffices or is required in order to exclude evidence. Put differently, conduct that shocks the conscience is sufficient, but not required to bar a state from introducing the evidence so obtained. The Supreme Court did not inquire into what is the minimum requirement for the application of its exclusionary holding. It simply ruled that the police conduct in that case was horrendous enough. See Rochin, 342 U.S. at 169-74, 72 S.Ct. at 208-10. The in banc majority today reads a "sufficient" standard as a "necessary" standard, without explaining why it sees no difference between them. I believe the difference is clear and substantial. Cf., e.g., Lee v. Weisman, --- U.S. ----, ----, 112 S.Ct. 2649, 2664, 120 L.Ed.2d 467 (1992) (Blackmun, J., concurring) ("Although our precedents make clear that proof of government coercion is not necessary to prove an Establishment Clause violation, it is sufficient."). That difference militates against making "shocks the conscience" a required test.
 
 
 114
 Second, the in banc majority conveniently shies away from defining the "shocks the conscience" standard. Neither the majority nor the defendants have been able to even imagine a scenario where the standard may be violated in the context of a police car chase. Not a single example has been proffered. It thus appears that the Constitution does not constrain police officers when conducting a high-speed car chase. The decision of the court today will have the practical effect of immunizing reckless police conduct from all strictures of the Constitution, so long as no search or seizure occurs.
 
 
 115
 Citing to numerous cases,[6] the majority believes it well settled that the "shocks the conscience" test applies when affirmative government actions are in dispute. See Maj.Op. at 1305. I assume that "affirmative government actions" involve intentional conduct. The majority's position, however, is contrary to Supreme Court authority. It is well recognized that "[w]hen holding in Davidson and Daniels that the Due Process Clause does not forbid negligent deprivations, the Court recognized that the Constitution forbids deliberate, unauthorized deprivations." Archie v. City of Racine, 847 F.2d 1211, 1218 (7th Cir.1988) (in banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989); William Burnham, Separating Constitutional and Common-Law Torts: A Critique and a Proposed Constitutional Theory of Duty, 73 Minn.L.Rev. 515, 524 (1989) ("The Court clearly indicated in Daniels that it would consider intentional conduct causing a loss to be deprivation and hinted in dictum that something less might suffice."). While it is clear conduct that "shocks the conscience" satisfies the "intentional conduct" standard endorsed by the Supreme Court, to make "shocks the conscience" a necessary standard would in many situations require more than intentional conduct. To do so, we must wait for the Supreme Court to modify its holding in Monroe, Parratt and Daniels so as to require more than intentional conduct.
 
 
 116
 As I discuss in Part III of this dissent, see infra at 1320-27, reckless conduct of governmental actors, which is somewhat less culpable than intentional conduct, constitutes an arbitrary exercise of governmental power and, thus, violates the Due Process Clause. Although not conscience-shocking, reckless conduct should be sufficient to state a cause of action under Sec. 1983 for substantive due process violations.
 
 
 117
 Thus, the "shocks the conscience" test would not only shield the reckless exercise of governmental power but also much of intentional conduct from the reach of a Sec. 1983 action (which conduct may not be so "conscience-shocking," but may yet be a clear violation of the Constitution and thus falling within Sec. 1983). Such a test would defeat the purpose of the Due Process Clause: to secure the people from the arbitrary exercise of governmental power.
 
 
 118
 3. The Impracticality of the "Shocks the Conscience" Test
 
 
 119
 Finally, the "shocks the conscience" test is hardly a test at all. By the majority's own admission, it would entail an "amorphous and imprecise inquiry." Maj.Op. at 1308. Having so characterized the "test," I do not understand why the in banc majority would call it a test, and force the district courts to apply it in cases before them. Grave and important matters such as litigated cases demand more. A definition of "amorphous" is:
 
 
 120
 1. Lacking definite form: SHAPELESS. 2. Of no particular sort: ANOMALOUS. 3. Lacking organization or methodical arrangement. 4. Lacking distinct crystalline structure.
 
 
 121
 Webster's II New Riverside University Dictionary 102 (1984). A test as defined by this dictionary appears to be impossible for all practical purposes. I understand that no authority forces the in banc majority to define its test. This, however, is not reason for us to shy away from defining a new standard that we announce. But, if the definition or description of "shocks the conscience" (with which to charge the jury or to apply to the facts of a particular case by the district court) is realistically impossible or unworkable, that is reason for us to hesitate before establishing such a test.
 
 
 122
 From the very day of its application in Rochin, the "shocks the conscience" test, if it can be called a test at all, has received harsh criticisms from many jurists, including notably Justice Black. In his concurrence in Rochin, Justice Black argued that the more specific Fifth Amendment ban on compelled self-incrimination applied. Rochin, 342 U.S. at 176, 72 S.Ct. at 211-12 (Black, J., concurring). He questioned the validity of the "shocks the conscience" test in Rochin, arguing that there was no constitutional authority for the Court to decide cases based on its notion of civilized decencies. Id. Subsequently, Justice Black detailed the evils of such a test:
 
 
 123
 With a "shock the conscience" test of constitutionality, citizens must guess what is the law, guess what a majority of nine judges will believe fair and reasonable. Such a test wilfully throws away the certainty and security that lies in a written constitution, one that does not alter with a judge's health, belief, or his politics.
 
 
 124
 Boddie v. Connecticut, 401 U.S. 371, 393, 91 S.Ct. 780, 794, 28 L.Ed.2d 113 (1971).
 
 
 125
 Justice Black was not alone. In Rochin, Justice Douglas also disagreed with the Court's reasoning, while concurring in the result. He stated that the Rochin holding "is to make the rule turn not on the Constitution but on the idiosyncrasies of the judges who sit here." Rochin, 342 U.S. at 179, 72 S.Ct. at 213 (Douglas, J., concurring).
 
 
 126
 Just one year after Rochin, a plurality in Irvine v. California criticized Rochin for failing to analyze the case in terms of "search and seizure" and declined to follow it. 347 U.S. 128, 133, 74 S.Ct. 381, 383, 98 L.Ed. 561 (1953) (plurality opinion). Concurring in Irvine, Justice Clark joined the chorus of criticism:
 
 
 127
 [The shocks the conscience test] makes for such uncertainty and unpredictability that it would be impossible to foretell--other than by guesswork--just how brazen the invasion of the intimate privacies of one's home must be in order to shock itself into the protective arms of the Constitution. In truth, the practical result of this ad hoc approach is simply that when five Justices are sufficiently revolted by local police action a conviction is overturned and a guilty man may go free. Rochin bears witness to this.
 
 
 128
 Id. at 138, 74 S.Ct. at 386 (Clark, J., concurring).
 
 
 129
 The campaign against the "amorphous" test persists with tenacity to this day. Only recently, and after the Collins case in which the in banc majority of this court saw unanimous adherence to the shock the conscience test, Justice Scalia explicitly called for the dismantling of that test:
 
 
 130
 If the system that has been in place for 200 years (and remains widely approved) 'shocks' the dissenters' consciences ... perhaps they should doubt the calibration of their consciences, or, better still, the usefulness of 'conscience-shocking' as a legal test.
 
 
 131
 Herrera v. Collins, --- U.S. ----, ----, 113 S.Ct. 853, 875, 122 L.Ed.2d 203 (1993) (Scalia, J., concurring). See also generally Antonin Scalia, The Rule of Law as a Law of Rules, 56 U.Chi.L.Rev. 1175 (1989).
 
 
 132
 With such a test applied to police car chase cases, not only will victims similarly situated received different treatments from the courts depending on which judge's (or jury's) conscience is being tested, law enforcement officers will also have trouble in tailoring their conduct so as to carry out their duties to the optimal extent without incurring liabilities.
 
 III. The Reckless Indifference Standard
 
 133
 To resolve the question left open by the Supreme Court, we must look to the Supreme Court's interpretation of the Due Process Clause for guidance. Although the guideposts in this area are sparse, I conclude that the basic formulation is whether the challenged conduct is an intentional violation or an arbitrary exercise of governmental power in a particular case. Reckless indifference toward the safety of the public in conducting a high speed police car chase constitutes either an intentional act or an arbitrary exercise of power. Therefore, I would hold that the standard in cases such as this is reckless indifference.
 
 
 134
 A. The Supreme Court's Elaboration of Due Process Law
 
 
 135
 In Daniels v. Williams, 474 U.S. 327, 329-33, 106 S.Ct. 662, 664-66, 88 L.Ed.2d 662 (1986), the Supreme Court synthesized the principles of due process of law. The Court noted that "[h]istorically, th[e] guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property." Id. at 331, 106 S.Ct. at 665. The Court then pinpointed the essence of due process jurisprudence, stating that the Due Process Clause was "intended to secure the individual from the arbitrary exercise of the powers of government." Id. (quotation marks and citations omitted). The procedural aspect of the Due Process Clause requires the government to follow appropriate procedures to promote fairness in governmental decisions. Id. The substantive aspect of the Clause bars "certain government actions regardless of the fairness of the procedures used to implement them," id., so as to "prevent governmental power from being used for purposes of oppression." Id. (citations and quotation marks omitted).
 
 
 136
 The position that the Due Process Clause forbids "arbitrary exercise" of governmental power has been emphasized by the Supreme Court time and again. See, e.g., Foucha v. Louisiana, --- U.S. ----, ----, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992) ("the Due Process Clause ... bars certain arbitrary, wrongful government actions"); Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985) ("[t]he question ... is whether ... [the defendant] acted arbitrarily"). As analyzed above, supra at 1312-13, the Collins case, the authority relied upon by the in banc majority, several times used "arbitrariness" as the touchstone for the plaintiff's claims. See --- U.S. ----, ----, 112 S.Ct. 1061, 1070-71, 117 L.Ed.2d 261 (1992). Professor Fallon, another authority cited by the majority, characterized arbitrariness as the "most familiar formulation." Richard H. Fallon, Jr., Some Confusions about Due Process, Judicial Review, and Constitutional Remedies, 93 Colum.L.Rev. 309, 325 (1993). He further proposed that the standard for us to measure substantive due process violations is arbitrariness or lack of rationality. Id. at 361-362. Such a standard "would occasion least disruption and contribute most to doctrinal uniformity." Id. at 361.
 
 
 137
 The Daniels Court further elaborated that "[o]ur Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." Daniels, 474 U.S. at 331, 106 S.Ct. at 665. Thus, the Supreme Court directed us to inquire into whether the challenged conduct involved a relationship between the governors and the governed, which is addressed by the Constitution. Such an inquiry must focus on the tie between the facts of the particular case and the exercise of government power. Id., at 332-34, 106 S.Ct. at 666. Mere negligence involves only "injuries that attend living together in society," id., at 332, 106 S.Ct. at 665, thus triggers only the protection of the state common law, not the Constitution. Id. at 333, 106 S.Ct. at 666.
 
 
 138
 This is to say, the Constitution is not an insurance plan to reimburse citizens for damages resulting from all hazards and vicissitudes of life. Rather, it only comes into play to prevent those hazards that involve the relationship between the governors and the governed, or that are created by exercise of government power. A criminal custody case, see, e.g., Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), is thus but one example of how challenged conduct could involve a governor-governed relationship. While it is true that such a relationship can more easily arise when a person is in the custody of the government than in some other context, this fact does not require that a Sec. 1983 action be limited to the criminal custody context. Indeed it is hard to see how a prisoner in a cell is any more helpless to protect himself against a fellow inmate's attack than an innocent citizen is to protect himself against a car barrelling down a dark city block without lights at 100 mph.[7]
 
 B. Reckless Indifference as the Standard
 
 139
 Under the above analysis, reckless conduct in the context of a police car chase should be sufficient to state a claim under Sec. 1983. The dispositive question is whether reckless indifference constitutes either a deliberate governmental act or an arbitrary exercise of governmental power.
 
 
 140
 1. The Exercise of Exclusively Governmental Power
 
 
 141
 We must first decide whether governmental power is involved and whether a relationship between the governor and the governed existed in this case. To do so, I examine the circumstances from which this case arose.
 
 
 142
 In pursuing fleeing suspects, police offices are engaged in an activity that is uniquely governmental in nature. They are attempting to apprehend suspects in order to take them into custody and, thus, enforce traffic or other laws that protect public safety. This is governmental conduct which private citizens generally cannot engage in. This police power is one of the exclusive prerogatives of the sovereign and its exercise has traditionally exclusively been reserved to the State. Cf. Flagg Bros., Inc., v. Brooks, 436 U.S. 149, 157-64, 98 S.Ct. 1729, 1734-37, 56 L.Ed.2d 185 (1978) (limiting state action by private parties to certain public functions that have traditionally exclusively been reserved to the government). Indeed, as the Statewide Guidelines state, "[e]mergency vehicle operations are an inherent activity in the performance of duties of law enforcement officers." App. at 3. Accordingly, it is clear that conducting a police car chase is a process of exercising governmental power.
 
 
 143
 The exercise of this governmental power in this case distinguishes this case from the run of the mill tort case between two private individuals, or between a private individual and a government agent who merely uses the highway as would a private actor (as in the case of a postal worker). The relationship between a victim injured by an exercise of governmental power and the governmental actor is dramatically different from that between two purely private individuals. The Supreme Court elaborated on this difference in the context of the misuse of federal power in this way:
 
 
 144
 Respondents seek to treat the relationship between a citizen and a federal agent unconstitutionally exercising his authority as no different from the relationship between two private citizens. In so doing, they ignore the fact that power, once granted, does not disappear like a magic gift when it is wrongfully used. An agent acting--albeit unconstitutionally--in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own.
 
 
 145
 Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 391-92, 91 S.Ct. 1999, 2002, 29 L.Ed.2d 619 (1971). The same is true when state actors are involved. The Court of Appeals for the Fifth Circuit similarly emphasized the fact that the governmental actor exploited his position and abused his power when recognizing a public school student's substantive due process claim for sexual molestation by her teacher. Doe v. Taylor Independent School Dist., 15 F.3d 443, 452 & nn. 3-4 (5th Cir.1994) (in banc) and 459 (Higginbotham, J., concurring).
 
 
 146
 The tie between the facts of a police car pursuit case and governmental power shows that the challenged conduct involves the relationship between the governors and the governed, rather than that between a private tortfeasor and a victim. In a police car chase case, the tortfeasors are law enforcement officers in the course of performing an official duty. Assuming the officers conducted a car chase with reckless indifference to the safety of the public, the plaintiffs were the governed who suffered death or severely debilitating injuries because they unfortunately stood in close proximity to the chase.
 
 
 147
 This scenario becomes extremely troubling when one bears in mind that the danger of reckless car chases is of great magnitude in today's society, with so many people relying on the orderly functioning of the public roads. Common sense should have made the police officers aware of the danger. If not, surely the Statewide Guidelines should have impressed upon them the potential risks. Viewing the record in the light most favorable to the plaintiffs, the police officers nevertheless conducted a reckless high speed chase resulting in the death of three citizens and crippling injuries for others. The recklessness of that conduct indicates that the officers knew or should have known the potential consequences of their conduct, but accorded no regard to the safety of the innocent victims.
 
 
 148
 While it is true that an individual may fall victim to the reckless driving of a private citizen, that risk is not created by an arbitrary exercise of governmental power. In recognition of such high risks of injury and death, the New Jersey Attorney General and the county prosecutors jointly promulgated the statewide police car pursuit guidelines with the express goal to "mandate[ ] that each law enforcement officer always put safety first, and ensure that whenever engaged in the operation of an Authorized Law Enforcement Emergency Vehicle, such operation is with reasonable due regard for the safety of the public whom he or she is sworn to protect." Statewide Guidelines, App. at 11. See also D.R. by L.R. v. Middle Bucks Area Vocat'l Tech. School, 972 F.2d 1364, 1373-76 (3d Cir.1992) (in banc) (state created danger may give rise to duty to protect), cert. denied, --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993);[8] William Burnham, Separating Constitutional and Common-Law Torts: A Critique and a Proposed Constitutional Theory of Duty, 73 Minn.L.Rev. 515, 567 (1989) (arguing for permitting the unintended plaintiffs to sue under Sec. 1983 for unintended injuries "so long as the government actor causes the injury while in the process of exercising power over someone").
 
 
 149
 2. Reckless Indifference as Intentional or Arbitrary Conduct
 
 
 150
 We must measure reckless conduct during a police car chase against the historically required deliberate governmental action or the "arbitrary exercise of governmental power," as the Supreme Court indicated in Daniels. I believe reckless indifference satisfies both.
 
 
 151
 Reckless indifference exists when a person acts
 
 
 152
 in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.
 
 
 153
 Restatement (Second) of Torts Sec. 500. Similarly, the Model Penal Code defines recklessness as conscious disregard of "a substantial and unjustifiable risk." Model Penal Code Sec. 2.02(2)(c). Characterized another way, reckless conduct "is established if the actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences." Medina v. City and County of Denver, 960 F.2d 1493, 1496 (10th Cir.1992). See also Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 692-93 & n. 3 (3d Cir.1993) (defining recklessness by quoting from Simmons v. City of Philadelphia, 947 F.2d 1042, 1090 (3d Cir.1991) (Sloviter, C.J., concurring), cert. denied, --- U.S. ----, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992), which in turn quoted from the definition in Black's Law Dictionary 1142-43 (5th ed. 1979)); Colburn v. Upper Darby Twp., 946 F.2d 1017, 1024-25 (3d Cir.1991) (Colburn II ) (defining recklessness). The risk and disastrous consequences are heightened in the police car chase in which life and safety of the public within the vicinity of the chase are endangered by the reckless police conduct.
 
 
 154
 Even under the most restrictive test for a Sec. 1983 action--intentional conduct--reckless conduct would qualify.[9] "The equation of reckless[ness] with deliberate conduct is familiar, on the ground that reckless disregard of a great risk is a form of knowledge or intent." Archie v. City of Racine, 847 F.2d 1211, 1219 (7th Cir.1988) (in banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). Recklessness contains an important behavioral attribute encompassed by intentional conduct, that is, intentionally taking a perceived risk. Restatement (Second) of Torts Sec. 500 cmt. b. The difference between reckless conduct and intentional conduct is but one thin line. "While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it." Id. cmt f. But harm results nonetheless because of the actor's reckless disregard of the risk. Accordingly, the common law allows punitive damages to be imposed on a reckless defendant, but not on a merely negligent defendant. Id. Sec. 501 cmt. b. Under certain modern statutes, reckless conduct constitutes wilfulness, which is punishable through civil penalties. E.g., Frank Irey, Jr., Inc. v. Occupational Safety & Health Review Comm'n, 519 F.2d 1200, 1207 (3d Cir.1975) (under OSHA, "[w]illfulness connotes defiance or such reckless disregard of consequences as to be equivalent to a knowing, conscious, and deliberate flaunting of the Act."), aff'd sub nom. Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977).
 
 
 155
 In the area of criminal law, the Model Penal Code makes recklessness the minimal culpability requirement if the statute does not prescribe the culpability sufficient to establish a material element of an offense. Model Penal Code Sec. 2.02(3). Thus reckless conduct is treated the same as purposeful or knowing conduct if the criminal statute does not differentiate them. Furthermore, criminal homicide committed recklessly under circumstances manifesting extreme indifference to the value of human life is murder, the same as committed purposely or knowingly. Id. Sec. 210.2(1)(b). Federal criminal law makes reckless conduct under certain circumstances a crime. See, e.g., 18 U.S.C. Sec. 1864(a)(3) (1988) (reckless use of hazardous and injurious device on Federal land or an Indian reservation).
 
 
 156
 In these situations, recklessness is tantamount to intent. Put differently, " 'Recklessness' is a proxy for intent." Archie v. City of Racine, 847 F.2d at 1220. To use the terms "tantamount" or "proxy" may be misleading. This court has already held that recklessness constitutes specific intent. United States v. Boyer, 694 F.2d 58, 59-60 (3d Cir.1982) (specific intent to deceive as required for mail fraud and securities fraud convictions under 18 U.S.C. Secs. 1341, 2 and 15 U.S.C. Secs. 77q(a), 77x may be found from a material misstatement of fact made with reckless disregard of the facts). Accordingly, it will break no new ground if we hold that reckless police conduct in this case constitutes a deliberate governmental act.
 
 
 157
 Assuming that reckless conduct in conducting high-speed police car chase does not constitute deliberate governmental action, it would surely satisfy the alternative touchstone for a due process violation, namely, the arbitrary exercise of governmental power. The exercise of governmental power is clear, and the question is whether recklessly conducting a police car chase is an arbitrary exercise of that power. A common definition of arbitrariness is:
 
 
 158
 In an unreasonable manner, as fixed or done capriciously or at pleasure. Without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment; depending on the will alone; absolutely in power; capriciously; tyrannical; despotic.
 
 
 159
 Black's Law Dictionary 104 (6th ed. 1990). By this definition, reckless conduct constitutes an arbitrary act. Reckless conduct, as established when the actor was aware of an obvious risk that was highly probable to lead to serious harm and proceeded in unreasonable disregard of the consequences, is precisely what arbitrariness is about.
 
 
 160
 Treating reckless governmental conduct as an arbitrary exercise of governmental power in violation of the Due Process Clause is supported by case law in our court as well as in several other courts of appeals. Very recently, a panel of this court held that recklessly disregarding facts in governmental decision making violated substantive due process. Parkway Garage, Inc., 5 F.3d at 692-93 & n. 3. The Court of Appeals for the Tenth Circuit held, in a case with facts almost identical to those in this case, that reckless intent suffices to state a violation of substantive due process. Medina, 960 F.2d at 1496. See also Part III.C of this dissent, infra at 1326-27.
 
 
 161
 Support for the reckless indifference standard is also found in the genesis of the Daniels rule: Justice Powell's concurring opinion in Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Disagreeing with the reasoning of the Court, Justice Powell argued that mere negligence "could not wor[k] a deprivation in the constitutional sense." Id. at 547, 101 S.Ct. at 1919 (Powell, J., concurring in result). His view was explicitly adopted by the Court in Daniels, 474 U.S. at 331-32, 106 S.Ct. at 664. Justice Powell, however, specifically stated that "[a] 'deprivation' connotes an intentional act denying something to someone, or, at the very least, a deliberate decision not to act to prevent a loss." Parratt, 451 U.S. at 548, 101 S.Ct. at 1919 (Powell, J. concurring in result) (emphasis added, footnote omitted). Justice Powell, the author of the Daniels rule, thus clearly did not envision that only conscience-shocking conduct violates the Due Process Clause. No matter what meaning people may attempt to attribute to Justice Powell's language, the phrase "a deliberate decision not to act to prevent a loss" does not mean conduct that "shocks the conscience." Fairly read, it connotes reckless conduct (or perhaps something less culpable). Therefore, under the exposition of Justice Powell, reckless conduct would suffice to state a cause of action under the Due Process Clause.
 
 
 162
 Moreover, deliberate indifference has been held by the Supreme Court to be sufficient to state a claim for violations of the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The test for violations of the Eighth Amendment should be the hardest to satisfy. A violation of the Due Process Clause should not require a more culpable mental state than a violation of the ban on cruel and unusual punishments. See Davidson v. Cannon, 474 U.S. 344, 358, 106 S.Ct. 668, 675-76, 88 L.Ed.2d 677 (Blackmun, J., dissenting).
 
 
 163
 I therefore would hold that the appropriate standard in this case is reckless indifference. Viewing the record in the light most favorable to the plaintiffs, the police officers by initiating and maintaining a reckless car chase without regard for the life and safety of citizens who happened to be in close proximity vividly demonstrated an arbitrary exercise of governmental power. Accordingly, I would hold that the plaintiffs had established enough facts to require a trial.
 
 3. Prudential Concerns
 
 164
 Allowing reckless conduct to state a claim in a police car pursuit case under the Due Process Clause and Sec. 1983 would serve the purpose of preventing arbitrary exercise of government power. Such a test would not make the Constitution "regulate liability for injuries that attend living together in a society." Daniels, 474 U.S. at 332, 106 S.Ct. at 665.
 
 
 165
 The existence of a unique relationship between the governmental actor and the injured victims, and an arbitrary exercise of governmental power in the form of the reckless conduct differentiate cases such as this from the ordinary tort cases. Cases with these elements present will only reach governmental actors performing strictly governmental functions, and will not be numerous. This allays any fear that the federal courts will be inundated and that recognizing such a cause of action "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976).
 
 
 166
 Finally, the standard of recklessness is neither "amorphous" nor "imprecise." It has been applied at common law since time memorial. Our district courts have vast experience in defining its parameters. Although ease of application is not our only goal, avoiding impracticality in the application of a rule is important. An unworkable "amorphous" test or ill-defined "catch phrase" is equivalent to no rule at all.
 
 C. Consistency with Case Law
 
 167
 Applying a recklessness standard in police car chase cases comports with this court's precedent. We have previously stated that "actions may be brought in federal court under Sec. 1983 when there has been infringement of a liberty interest by intentional conduct, gross negligence or reckless indifference, or an established state procedure." Davidson v. O'Lone, 752 F.2d 817, 828 (3d Cir.1984) (in banc), aff'd sub nom., Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). Relying on Davidson, we have reaffirmed a reckless indifference standard in a series of cases involving detainees who committed suicide. See Colburn v. Upper Darby Twp., 946 F.2d 1017, 1024 (3d Cir.1991) (Colburn II ); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 464 & n. 10 (3d Cir.1989); Colburn v. Upper Darby Twp., 838 F.2d 663, 668 (3d Cir.1988) (Colburn I ), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989).
 
 
 168
 The reckless indifference standard has also been applied to other contexts. In Metzger By & Through Metzger v. Osbeck, 841 F.2d 518 (3d Cir.1988), a high school gym teacher seriously injured a student while trying to discipline him. We reversed the grant of summary judgment in favor of the defendant because a genuine issue of material fact existed as to whether he intended to harm his victim. Id. at 520 & n. 1, 521. We further stated that under Davidson and Colburn I, "it appears likely that at a trial of this case charges on gross negligence or recklessness will be appropriate." Id. at 520 n. 1.
 
 
 169
 The sole exception is our decision in Searles v. Southeastern Pennsylvania Transportation Authority, 990 F.2d 789 (3d Cir.1993), where the court used broad language which appeared to endorse a "shocks the conscience" standard. However, as I explained, supra at 1311-13, this case focused on the existence of constitutional duty, rather than standard of care. Moreover, Searles addressed only mere omission while in the case sub judice affirmative governmental action is in dispute.
 
 
 170
 Selecting the reckless conduct standard is consistent with the approach of two other courts of appeals in police pursuit cases decided after Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The Court of Appeals for the Tenth Circuit requires reckless intent. Medina v. City & County of Denver, 960 F.2d 1493, 1496 (10th Cir.1992). The Sixth Circuit requires gross negligence, where the defendant "intentionally does something unreasonable with disregard to a known risk or a risk so obvious that he must be assumed to have been aware of it, and of a magnitude such that it is highly probable that harm will follow." Jones v. Sherrill, 827 F.2d 1102, 1106 (6th Cir.1987) (quotation marks and citations omitted). This definition closely resembles reckless indifference. Two other courts of appeals have held that gross negligence is not sufficient, but they have not indicated whether recklessness would suffice. See Roach v. City of Fredericktown, Mo., 882 F.2d 294, 297 (8th Cir.1989); Cannon v. Taylor, 782 F.2d 947, 950 (11th Cir.1986).
 
 
 171
 In different factual contexts, two other courts of appeals explicitly adopted the recklessness standard. The Court of Appeals for the First Circuit held that the standard by which to decide whether state caseworkers unconstitutionally denied court access to a juvenile offender committed to their care is "reckless or callous indifference." Germany v. Vance, 868 F.2d 9, 18 (1st Cir.1989). The full Court of Appeals for the Seventh Circuit similarly embraced recklessness as the test to decide whether a fire department's failure to provide rescue service violated the Due Process Clause. Archie v. City of Racine, 847 F.2d 1211, 1218-19 (7th Cir.1988) (in banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). The court equated recklessness with deliberate conduct, recognizing that " '[r]ecklessness' is a proxy for intent," id. at 1220.
 
 
 172
 Moreover, selecting a reckless indifference standard is supported by the fact that deliberate indifference has been held to be the standard to gauge the liability of local governmental entities, City of Canton v. Harris, 489 U.S. 378, 381, 109 S.Ct. 1197, 1200-01, 103 L.Ed.2d 412 (inadequate police training), and individual supervisors, Doe v. Taylor Independent School Dist., 15 F.3d 443, 452-54 (5th Cir.1994) (in banc) (sexual molestation of student by public school teacher), for substantive due process violations.
 
 
 173
 In contrast, the Court of Appeals for the Fourth Circuit explicitly adopted the "shocks the conscience" test. See Temkin v. Frederick County Comm'rs, 945 F.2d 716, 720 (4th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992). The Court of Appeals for the Fifth Circuit appeared to employ that test, but its emphasis was on whether there was "intentional misuse" of police vehicles. See Checki v. Webb, 785 F.2d 534, 538 (5th Cir.1986).
 
 
 174
 These two cases are not persuasive. The Checki court provided little analysis, merely intimating that the misconduct in that case may be "conscience-shocking." It appeared that the Checki court concluded that the conduct was sufficient to state a claim. It did not state that "conscience-shocking" conduct was required. Id.
 
 
 175
 The Temkin court adopted the "shocks the conscience" standard for police pursuit cases, while retaining a deliberate indifference standard for custody cases, reasoning that a more favorable standard of care should apply to detainees because they are under the state's control and are easily subject to abuses of governmental power. 945 F.2d at 720-21. The court was obviously persuaded by dicta in two Supreme Court cases stating that automobile accidents would not be constitutional in nature merely because one of the drivers is a government official. See Temkin, 945 F.2d at 722 (citing Parratt v. Taylor, 451 U.S. 527, 544, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981) ("party who is involved in nothing more than an automobile accident with a state official" has no constitutional claim); Paul v. Davis, 424 U.S. at 698, 96 S.Ct. at 1159 ("survivors of an innocent bystander ... negligently killed by a sheriff driving a government vehicle" have no constitutional claim)).
 
 
 176
 In these cases, the Supreme Court was merely reiterating, by way of example, that ordinary state torts committed by government employees, who travel on the highways as would a private citizen, do not violate the Constitution. A vast difference exists between a negligent driver who happens at the same time to work for the government, and a police officer who operates a motor vehicle to catch his target with reckless disregard for human life. A reckless high-speed police pursuit is not comparable to the typical negligent automobile accident. The operation of police vehicle in a high speed car pursuit is a process of exercising governmental power. A recklessly conducted car chase involves an abuse of police power uniquely vested in the government. It is not simply a policeman travelling in a leisurely manner on the highway to go to work as would a private citizen.IV. The Majority's Assessment of the Facts
 
 
 177
 The majority's assessment of the police conduct in Part II.B and its implicit message that the police conduct may not after all constitute "reckless indifference" is puzzling. See Maj.Op. at 1302-03. What the majority does is not faithful to the proper course of appellate adjudication at this stage of the case.
 
 
 178
 The matter came to the in banc court for resolution of the legal question: the standard by which we decide whether there is a deprivation under the Due Process Clause. We are not called upon to assess the facts of the case.
 
 
 179
 Secondly, the majority decides that the test is whether the police conduct "shocks the conscience." Whether the police conduct constitutes reckless indifference is simply irrelevant to the majority's adjudication today. The fact that the majority has volunteered an advisory opinion implying that the police conduct may not even constitute reckless indifference is troubling.
 
 
 180
 Moreover, the district court denied the defendants' summary judgment motion on the issue of whether there was any genuine issue of material facts that would prove reckless indifference to the safety of the plaintiffs. Were this an issue presented to the in banc court, prudence counsels that this court not disturb the determination of the district court, as no new facts had been brought to the attention of the court after Judge Rodriguez denied the defendants' motion for summary judgment. In any event, in passing upon the validity of a grant of summary judgment, we are required to assess the facts in the light most favorable to the non-moving party. I take consolation in the ability of the district court to prevent its view of the facts, with respect to the issues not decided by the in banc court, from being colored by the majority's assessment of the facts.
 
 V. Conclusion
 
 181
 For the foregoing reasons, I respectfully dissent. I would hold that the appropriate standard by which to determine a "deprivation" under the Due Process Clause is reckless indifference. I would remand the case to the district court for a trial.
 
 
 
 [1]
 The relevant portions state:
 A. When to pursue
 Generally, police officers shall make every responsible effort to apprehend a fleeing vehicle. Therefore, a pursuit may be initiated whenever a law violator refuses to stop and uses his vehicle to flee. The pursuit should always be tempered with common sense and the officer should be aware of the degree of hazard to which he exposes himself and others. The decision to conduct such a pursuit should depend upon the seriousness of the threat that the violator presents to other persons or to society in general; hence the objective of the pursuit must be to apprehend a violator, and the purpose of the apprehension must be to bring the perpetrator to trial....
 A police officer, prior to initiating a pursuit involving excessive emergency speed and emergency driving tactics or techniques, should consider the following:
 
 
 [1]
 The nature of the violation
 
 
 [2]
 The likelihood of successful apprehension
 
 
 [3]
 The hazard created by the high speed pursuit
 
 
 [4]
 The volume, type, speed and direction of the traffic
 
 
 [5]
 The nature of the area, whether residential, commercial, school zone, open highway, etc
 
 
 [6]
 The population density
 
 
 [7]
 Familiarity with the roads
 
 
 [8]
 The weather and road conditions; i.e., the width and curves of the roadway; stopping and sight distances
 
 
 [9]
 The officer's driving skills and condition of the police vehicle
 B. Nature of Pursuits
 The following circumstances are offered as guidelines to be used in considering when and whether a pursuit should be commenced.
 
 
 [1]
 Non-hazardous violations such as motor vehicle equipment defects, inspection overdues, and registration violations, never warrant prolonged pursuit or the operation of a motor vehicle at excessive speeds. The risk exceeds the necessity for immediate apprehension
 
 
 [2]
 Completed violations. Where the danger has passed, i.e., failure to obey a stop sign, a traffic signal, improper passing, or any other non-continual violation, a prolonged pursuit of a motor vehicle at excessive speeds is seldom warranted, particularly when it may cause a greater risk than the violator intended. The responsible discretion of the police officer is relied on very heavily to justify his decision to pursue or not to pursue
 
 
 [3]
 Indictable violations and continuing hazardous violations. Pursuit is often necessary to make an apprehension of one suspected of the commission of an indictable offense. In such instances, serious potential for bodily harm or property loss may occur in the event that apprehension does not occur immediately. For example, in kidnapping, destruction or abandonment of critical contraband or evidence, commercial theft, burglaries or the flight of a first or second degree offender, the need to apprehend is paramount but must be weighed against the dangers involved to other highway users, pedestrians, the officer in pursuit and the suspect
 Guidelines at 3-5; Plaintiffs' App. at 4-6.
 
 
 [2]
 A reasonable officer would have been aware that a driver permitting a passenger to hang half-way out of the T-top of an automobile at 2:00 a.m. might have been intoxicated, a hypothesis which was ultimately substantiated in this case
 
 
 [3]
 It is apparent that the Supreme Court used the phase "arbitrary" as an alternative for, or synonymous with, "conscience-shocking." To the extent the dissent accepts the need to show arbitrary governmental action to constitute a violation of substantive due process, it does not stray far from the majority position. The district court applied the "shocks the conscience" test, the parties have focused their briefs on that test, and, under these circumstances, no purpose is served at this juncture to concentrate on "arbitrary" as distinguished from "conscience-shocking."
 
 
 [4]
 In other recent cases involving affirmative government conduct, the Justices authoring dissenting opinions applied the "shocks the conscience" test as the constitutional touchstone against which substantive due process violations should be measured. See, e.g., Herrera v. Collins, --- U.S. ----, ----, ---- - ----, 113 S.Ct. 853, 876, 878-79, 122 L.Ed.2d 203 (1993) (Blackmun, J., dissenting, joined by Justices Stevens and Souter) (execution of innocent defendant is conduct which is more shocking than stomach pump in Rochin ); Foucha v. Louisiana, --- U.S. ----, ----, 112 S.Ct. 1780, 1809, 118 L.Ed.2d 437 (1992) (Thomas, J., dissenting, joined by Chief Justice Rehnquist and Justice Scalia) (legislation permitting continued confinement of insanity acquitee until he is able to demonstrate that he is not dangerous to himself and others does not shock the conscience)
 
 
 [5]
 Since the Supreme Court's opinion in Graham v. Connor, 490 U.S. 386, 394-95, 109 S.Ct. 1865, 1870-71, 104 L.Ed.2d 443 (1989), excessive force claims against the police are actionable under the Fourth Amendment rather than the substantive component of the Due Process Clause. However, where the excessive force does not involve a "seizure" by law enforcement officials, courts have held that a "shocks the conscience" substantive due process claim survives Graham. See, e.g., Wilson v. Northcutt, 987 F.2d 719, 722 (11th Cir.1993)
 
 
 [6]
 We cannot ignore the Supreme Court's repeated warnings against an overly generous interpretation of the substantive component of the Due Process Clause. See Collins, --- U.S. at ----, 112 S.Ct. at 1068 ("As a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." (citation omitted)); see also Albright v. Oliver, --- U.S. ----, ----, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994) (plurality opinion) (quoting Collins with approval); id. at ----, 114 S.Ct. at 820 (Souter, J., concurring in judgment) (same); Wroblewski v. City of Washburn, 965 F.2d 452, 457 (7th Cir.1992) ("The Supreme Court has insisted upon caution and restraint in courts' application of substantive due process.")
 
 
 [7]
 Significantly, in this case as in Collins, the plaintiffs have not alleged deliberate action, a factor the Collins Court emphasized when it noted that the plaintiff had "not charge[d] the city with a wilful violation of Collins' rights ... [or] claim[ed] that the city or any of its agents deliberately harmed her husband." --- U.S. at ---- - ----, 112 S.Ct. at 1068-69. According to one commentator, this language "suggest[s] that 'deliberate' conduct [i]s required for a due process violation." 1 Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983 Sec. 3.13, at 35 (3d ed. Supp.1992)
 
 
 [8]
 Admittedly, the Tenth Circuit applied a "reckless intent" to a police pursuit in Medina, 960 F.2d at 1494. For the reasons stated in the opinion, and in the precedent cited here, we are not persuaded
 
 
 [9]
 The dissent purports at the inception of its opinion not to address other elements in this case "such as the existence of a constitutional duty." Dissenting Op. at 1310. Its opinion is then replete with discussion of the duty the dissent believes is applicable. See, e.g., id. at 1315 n. 4 ("As far as duty of care is concerned, there is no dispute that the police officers in this case owed a duty toward the innocent passerbys."). The dissent recognizes that "[t]he absence of such a duty would be the death knell for the plaintiffs in this case," id., and assumes that the majority does not deny the existence of such a duty. The dissent was right the first time. The district court did not grant summary judgment on that basis and the parties have not argued the duty issue in this court. Were we to consider the existence of a duty we would be faced with the applicability of the long line of cases holding that government officials are not liable for harm inflicted by third parties, such as that inflicted by Pindale's accident, on persons who are not in custody. See, e.g., Martinez v. California, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980); DeShaney v. Winnebago County Dept. of Social Serv., 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); Commonwealth Bank & Trust Co., N.A. v. Russell, 825 F.2d 12 (3rd Cir.1987). Moreover, the dissent's reliance on the statewide guidelines for the existence of a duty seems contrary to the well-accepted principle that duties under state law cannot create constitutional obligations. See Collins, --- U.S. at ----, 112 S.Ct. at 1070; D.R. by L.R. v. Middle Bucks Area Vocat'l Tech. School, 972 F.2d 1364, 1375-76 (3rd Cir.1992)
 
 
 [1]
 It would be at least as strange for the Supreme Court to resolve the question it expressly reserved ruling on in Daniels, and to undermine if not reject the decisions rendered by the many courts of appeals that, as the in banc majority acknowledges, "have determined that a reckless or even grossly negligent act is actionable under the Due Process Clause," Maj.Op. at 1305, without even mentioning these cases
 
 
 [2]
 In this connection, I note that our court sitting in banc after the Supreme Court decided Collins in February 1992, stated in August 1992 that "in DeShaney the Supreme Court rejected the 'shocks the conscience' test of Rochin ... as a standard for imposing Sec. 1983 liability." D.R. by L.R. v. Middle Bucks Area Vocat'l Tech. School, 972 F.2d 1364, 1377 (3d Cir.1992) (in banc), cert. denied, --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993). Earlier, we stated that "actions may be brought in federal court under Sec. 1983 when there has been infringement of a liberty interest by intentional conduct, gross negligence or reckless indifference, or an established state procedure." Davidson v. O'Lone, 752 F.2d 817, 828 (3d Cir.1984) (in banc), aff'd sub nom., Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). The in banc majority has not explained why it rejects such statements in other in banc opinions of this court
 
 
 [3]
 The in banc majority's attempt to reconcile the reckless indifference standard that we have repeatedly employed in the custody context with the "shocks the conscience" standard it adopts today is deeply troubling. By creatively and retroactively recasting the language we have used to articulate legal standards, I fear that the majority weakens any argument this court might make that our standards, and the words we use to express them, do have some meaningful, reliable content
 
 
 [4]
 As far as duty of care is concerned, there is no dispute that the police officers in this case owed a duty toward the innocent passersby. The Statewide Guidelines Adopted by the New Jersey Attorney General and the New Jersey County Prosecutors' Association Regarding High Speed Motor Vehicle Pursuits (the "Statewide Guidelines") themselves acknowledge such a duty and mandate that all police officers put safety first and conduct car pursuit with due regard to the safety of the public. See App. at 11. Nor does the in banc majority presumably deny the existence of such a duty. The absence of such a duty would be the death knell for the plaintiffs in this case. See Collins, --- U.S. at ----, 112 S.Ct. at 1068-1070; DeShaney, 489 U.S. at 194-203, 109 S.Ct. at 1002-1007; D.R. by L.R. v. Middle Bucks Area Vocat'l Tech. School, 972 F.2d 1364, 1368-76 (3d Cir.1992) (in banc), cert. denied, --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993)
 
 
 [5]
 Even the academic authority cited by the majority, see Maj.Op. at 1306, harshly criticizes using the reluctance to recognize a plaintiff's cause of action to decide whether a violation of the Due Process Clause occurred. Richard H. Fallon, Jr., Some Confusions about Due Process, Judicial Review, and Constitutional Remedies, 93 Colum.L.Rev. 309, 309 ("[the] recurrent efforts to shape due process law to promote policy ends have also taken a toll on doctrinal integrity") & n. 2 (1993)
 Academic commentators have proposed various theories that would help solve the problem of docket congestion. One of these theories is to focus on the constitutional duty of the governmental actors while weeding out the common law tort cases where no governmental power was involved. See generally William Burnham, Separating Constitutional and Common-Law Torts: A Critique and a Proposed Constitutional Theory of Duty, 73 Minn.L.Rev. 515 (1989). Another theory is to characterize certain cases as "abstention" cases, Henry P. Monaghan, State Law Wrongs, State Law Remedies, and the Fourteenth Amendment, 86 Colum.L.Rev. 979, 987-88 (1986), thus permitting the federal courts to recognize certain causes of action but not have to decide the cases until certain state systemic inadequacies arise. Again, the authority cited by the majority, Professor Fallon, endorsed this characterization and elaborated on it in great length, Fallon, supra, at 344-52, and proposed arbitrariness or rationality as the test to measure the substantive adequacy of state remedies, id. at 361-62. But the majority ignores the thrust of his argument, while citing him as the authority for the "shocks the conscience" test.
 
 
 [6]
 I note that at least some cases do not support the majority's position. Black v. Stephens, 662 F.2d 181 (3d Cir.1981), has been invalidated by Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), which mandates that courts apply a reasonableness test in the type of cases of which Black is one. The court in Newell v. Brown, 981 F.2d 880, 886 (6th Cir.1992), cert. denied, --- U.S. ----, 114 S.Ct. 127, 126 L.Ed.2d 91 (1993), had doubts about the "shocks the conscience" as a required test, characterizing it as being "widely believed."
 
 
 [7]
 I note that the Court of Appeals for the Tenth Circuit relied in part on a custody case, Harris v. Maynard, 843 F.2d 414 (10th Cir.1988), when adopting the reckless intent standard for police car chase cases in Medina v. City and County of Denver, 960 F.2d 1493, 1496 (10th Cir.1992), thus implicitly rejecting the majority's distinction between custody and noncustody cases
 
 
 [8]
 The majority faults the dissent for discussing "duty." Maj.Op. at 1308 n. 9. It is obvious that I mentioned duty not to treat it as an issue (there is no issue as to the existence of duty in this case), but to point out that the majority misplaces its reliance on many cases that focused on duty rather than on standard of care, which is the sole issue in this case. The discussion of duty was also interjected in order to reject the majority's novel theory of treating custody as a factor to elevate the standard of care
 The majority is making much ado about nothing since the existence of duty is not an issue in this case. The defendants conceded it. They did not argue it either before the district court, the panel or the in banc court. The district court based its decision on the sole ground that the police misconduct did not violate the standard of care. The defendants petitioned for rehearing in banc on the sole ground that the panel incorrectly adopted the recklessness standard. See Petition for Rehearing en Banc 2-10. The in banc court also limits its decision to the sole question of what is the standard of care. Maj.Op. at 1302.
 
 
 [9]
 The majority argues that "[t]he dissent, without any basis in the pleadings or in the record, has chosen to magnify [the police officers'] culpability, equating ... 'reckless police conduct in this case,' ... to arbitrary, intentional, and deliberate governmental action." Maj.Op. at 1307. The majority misreads the dissent. I argue that recklessness, as a matter of law, not because of anything in the record (as long as recklessness is established), can be equated to intentional conduct. There is no "magnification" here